**James O. ROGERS, William M. Burmeister, Conservative Care, Inc., and Care Affiliates, Inc., Appellants,**

v.

**Daniel ALEXANDER, Leslie Alexander, and Judith Pucci, Appellees.**

No. 05–05–00233–CV.

Court of Appeals of Texas, Dallas.

June 29, 2007.

Deborah G. Hankinson, Law Office of Deborah G. Hankinson, James David Brown, Winstead Sechrest & Minick, Dallas, Christopher A. Kalis, Law Offices of Christopher Kalis, Plano, for Appellants.

Peter Dermot Marketos, Haynes & Boone, L.L.P., Scott A. Scher, Law Office of Scott A. Scher, Dallas, for Appellees.

Before Justices BRIDGES, FRANCIS, and LANG–MIERS.

## OPINION

Opinion by Justice BRIDGES.

James O. Rogers, William M. Burmeister, Conservative Care, Inc., and Care Affiliates, Inc., appeal the trial court's judgment, following a jury trial, in favor of Daniel Alexander, Leslie Alexander, and Judith Pucci. In nineteen issues, appellants argue (1) there is no evidence to support an award of damages on any of appellees' claims; (2) appellees' expert witness was unqualified, unreliable, and used faulty damage models; (3) appellees have no standing to recover damages, even if they presented some evidence of damages; (4) appellees are not entitled to declaratory relief; (5) the contract between the parties was not illusory, unconscionable, or unenforceable; (6) there is no evidence of fraud, civil theft, fraudulent inducement, breach of contract, or civil conspiracy; (7) there is no clear and convincing evidence to support the award of punitive damages, (8) the admission of certain irrelevant and prejudicial evidence entitles appellants to a new trial; (9) the damages awarded are

excessive, and (10) the judgment violates the election-of-remedies doctrine. We affirm the trial court's judgment.

In March 2002, Daniel Alexander, his wife, Leslie Alexander, and Judith Pucci formed Alexander & Pucci, L.L.C. d/b/a Accent Home Health (Accent). Daniel served as chief financial officer, Leslie became Accent's administrator, and Judith was Accent's director of nursing. Accent hired an accounting firm and obtained a state license and a Medicare certification in August 2002 so that it could both see patients in Texas and accept Medicare insurance money.

Other than the funds Leslie, Daniel, and Judith had put into Accent, Accent had received no outside funds between March 2002 and August 2002. Nevertheless, money from pending Medicare claims was "building in an account" until Accent was approved to accept Medicare patients. Daniel and Leslie took more money out of their savings, Judith took a loan from her mother, and Leslie "started hopping on the phone calling Medicare trying to get this connection put in place." Leslie succeeded in speeding up the approval process, and Accent began receiving its Medicare payments in September 2002. With the Medicare payments, Accent had "more money coming in than [it was] spending." By the end of 2002, Accent showed a profit of almost $36,000, and Daniel, Leslie, and Judith were able to pay themselves salaries and give a bonus to themselves and all of their employees.

In December 2002, Rogers contacted Daniel to "talk about home health." Rogers was a neighbor of a friend of Daniel's. Daniel and Leslie met with Rogers at a restaurant and discussed Accent's startup and operations. Leslie "walked away [from the meeting] not quite sure exactly what Mr. Rogers did." Nevertheless, Rogers scheduled another meeting where Leslie got the impression Rogers was involved in outpatient therapy and felt that he and Accent could work together. Rogers represented that he was a certified public accountant and had a master's degree in accounting. It appears from the record that Rogers is not a certified public accountant.

On January 6, 2003, Daniel and Leslie met with Rogers again and Rogers represented that he had outpatient clinics and could help Accent with staffing as it grew. Rogers also reiterated his status as a C.P.A. and indicated he had personal contacts with "between fifty and a hundred doctors," had been in the health care industry for many years, and had helpful connections throughout the metroplex. Rogers said that he could also help with day-to-day accounting. The next meeting, which also included Judith, occurred at Rogers' outpatient therapy clinic where Rogers made a business proposal that he wrote out on a "scratch sheet." Leslie had already described to Rogers her plans to expand Accent's operations by opening another office in August or September.

Rogers stated that they were losing $40,000 to $60,000 per week in referrals he could bring to Accent because he did not have a license to provide home health care. Under the deal Rogers presented, Daniel, Leslie, and Judith would keep one hundred percent of the business Accent already had. As to the "vast amount of business" that Rogers would bring to Accent, Rogers would keep eighty percent with the remaining twenty percent split between Daniel, Leslie, and Judith. "[T]he biggest benefit" of Rogers' proposal was that he would provide money to enable Accent to "start expanding immediately," open another agency, and take all of Daniel's Leslie's and Judith's money out of the bank. Rogers said he was an "accredited investor," which "meant that he could walk into

a bank and get a loan for at least seven figures." Rogers asked what Leslie thought it would cost to start expanding right away, and she indicated it would take about $150,000 to start another agency and get the necessary license and another $100,000 to cover expenses once they took their money out of Accent. Rogers stated he would be "hands off in the day-to-day operations of the company," but he would help with the accounting. Rogers said he would write up a "term sheet" and meet at Accent's office to review it.

On January 14, 2003, Rogers brought a term sheet representing the "agreement to go into business together." Rogers explained that he would give a "financial commitment of $250,000," Daniel, Leslie, and Judith would "keep 100 percent of what was ours," Rogers "would get 80 percent of what he was bringing on," and Daniel, Leslie, and Judith would "then receive 20 percent of that." According to Rogers, the term sheet was prepared by a law firm he had "used for years," and it was best if he, Daniel, Leslie, and Judith all used the same attorneys because the new venture would benefit from their experience. As to "Funding," the term sheet provided, in pertinent part:

> From and after the Closing, Rogers agrees to fund, up to the Funding Commitment (as hereinafter described), all cash operating needs of the Company. The Current Members recognize that as a result of their ability to both extract all cash existing as of the Closing and be paid all of the future collected cash from the Existing A/R, the Company will have a need for funding from Rogers to pay all ongoing operating expenses. The Funding Commitment shall mean Rogers funding up to $250,000 on or before June 30, 2003 to fund the ongoing expenses of the Company. Rogers and the Current Members expect that this commitment by this date will be suffi-

cient for the Company to thereafter operate without the need for further influx of capital from its Members.

Daniel, Leslie, Judith, and Rogers signed the term sheet because, Leslie testified, "We all agreed that this is what was going to be our contract." Leslie understood that the contract based on the term sheet would be drawn up by "our attorney," whom Rogers had worked with for thirteen years. Rogers said he would get the contract together, and the deal would close on January 21 at the attorney's office.

On January 17, Daniel, Leslie, and Judith met Rogers at a restaurant and went over a document entitled "Investment Agreement." Rogers summarized each paragraph of the Investment Agreement. Leslie, Daniel, and Judith each initialed handwritten changes indicating that "Post–Closing Membership Percentage Interests" would be eighty percent for Rogers, and 6.66 percent each for Daniel, Leslie, and Judith. They also signed the document "to validate for the attorney," and, as provided in paragraph 1.2 of the agreement, understood "The purchase and sale of the Interest (the 'Closing') shall take place at [the attorney's office], effective after the close of business on January 21, 2003 (the 'Closing Date')."

Specifically, Rogers stated that, on January 21, he, Daniel, Judith, and Leslie would go to the attorney's office, "have any questions answered, sign the agreement, and [Daniel, Leslie, and Judith] would get [their] money and [Rogers] would put in $250,000 into the company." Also at the closing, Daniel, Leslie, and Judith would execute the "funding note," which was a note for repayment of Rogers' $250,000 investment in the company. At the January 17 meeting, however, Rogers had Judith sign the note though he asked her not

to date it because "he was going to take it and get it corrected" and "it was just showing our attorneys that our signatures matched our initials." Also at closing, Leslie was to bring a list of existing clients from whom Accent would continue to receive one hundred percent of revenue after the closing. Although the agreement had an "Exhibit E" for listing existing clients, it was blank.

Prior to January 21, Rogers contacted Leslie and said he "didn't have all the financials and we wouldn't be ready to close." Accent's "year-end closeout of 2002" was not yet finished, and Leslie still believed the deal would close. Rogers began coming to Accent's office to look at Accent's books and records. Leslie got the final 2002 records on January 27 and gave them to Rogers. However, Rogers said he "needed to review the books and records and do some reconciliation before he could distribute any funds." Leslie also gave Rogers a copy of the software containing Accent's financial information, but Rogers said "it was going to take some time to go over the books and he needed to now get into—see the direct deposits in the bank accounts." Leslie added Rogers to the signature card at Accent's bank because she "had full confidence that once [Rogers] got into the books and records he would get what he needed to get us our money and fund the note."

During this time, Accent was "growing like crazy," and Leslie assumed nursing duties in the field, putting 13,000 miles on her car between January and March. At night, Leslie returned to Accent's office and showed Rogers Accent's software containing all of the Medicare information on patients. Leslie was "starting to teach [Rogers] home health" and "going through with what [she] understood to be [her] part of the agreement." At the end of February, still with no closing, Rogers introduced Leslie to Burmeister who, Rogers said, was his CFO and a C.P.A. At the time, Leslie was still "entering the books into [Accent's] accounts" and keeping a cash flow, and Rogers told her Burmeister could take over those duties.

Burmeister took over Accent's accounts payable. Leslie had so many other things to do that it "seemed perfectly reasonable." Prior to this, at the end of each month, Leslie, Daniel, or Judith would gather up all the receipts from the accounts payable, run receipts off the software program, and give them to their accountants along with Accent's bank statements. Burmeister participated in helping Leslie provide the accountants with this information in February or March, but after that Leslie provided everything to Burmeister and thought he was continuing to forward everything to the accountants. In May or June, however, Leslie learned Burmeister had not forwarded anything to the accountants.

One of the reasons Leslie was not concerned that Burmeister had taken over the accounting was that Leslie, Daniel, and Judith had online access to Accent's accounts and could check their status at any time. In March, Judith called Leslie to tell her a $95,000 withdrawal had been made from Accent's bank account. Leslie requested a copy of the transaction and learned Rogers had transferred the $95,000 into a Bank One account. A meeting with Rogers was called, and Rogers explained the money had been used to open a Bank One account. According to Rogers, Accent was such a fledgling company that it needed to establish a line of credit with Bank One. Rogers explained he dealt in finance and business all the time, and this was a "very normal thing." Rogers told Leslie, Daniel, and Judith that they "just need[ed] to relax and calm down and let [him] finish getting the accounts

reconciled." However, neither Daniel, Leslie, nor Judith were put on the signature card at Bank One or received online access or any other access to the account or received any Bank One statements. Leslie later learned that Burmeister had opened the Bank One account and received the statements.

In the weeks following the $95,000 transfer, there was another transfer for $34,000, and Leslie, Daniel, and Judith were "getting quite anxious." Accent's accountants had met with Rogers and produced a January interim cost report showing Accent made $30,000 profit in January alone. Rogers told Leslie that the accountants' reports were wrong because they were not done according to Medicare standards. Leslie believed that Rogers was a C.P.A., and he told her there was "something wrong with the books and he needed to investigate that further."

On April 3, 2003, shortly after Leslie began asking about the $95,000 transfer, Rogers sent an email to Leslie saying the "first checks [were] on the way." Leslie testified Rogers "wasn't sure because the accounts weren't reconciled, but he needed to take our edge off and so he was going to go and give us some money." Rogers sent checks for $18,000 to Leslie and Judith and $9000 to Daniel, drawn on the Bank One account in Accent's name. In May, Daniel and Leslie each got "another small check," but "other than that, nothing." Instead of the $250,000 investment Rogers was supposed to make, he invested nothing in Accent. During April, May, and June 2003, Leslie repeatedly asked Rogers for Accent's books and records but received nothing. Finally, on June 24, 2003, Rogers gave Leslie, Daniel, and Judith a balance sheet showing losses and a line item for a $152,181.26 "Allowance for Doubtful Accts." The balance sheet also showed a purported $100,000 "Bank One Funding"

and an additional $150,000 "Line for Expansion." Leslie later learned the $100,000 "Bank One Funding" consisted of funds in the Bank One account into which Rogers moved the $95,000. Once Rogers moved the $95,000 into the account, he withdrew his $100,000 and began "operating off [Accent's] funds."

When Leslie saw the balance sheet and asked where the money was for the $100,000 "Bank One Funding" and the "Line for Expansion," Rogers "yanked the paper out of [Leslie's] hands" and said, "You don't trust me." Leslie told Rogers, "This is business, and I need to see the accounts. I am responsible to the federal government for these monies." Rogers said he would get in touch with Burmeister and get back to her. At that point, Leslie was "pretty much done" and told Rogers she was "stepping away." Rogers said he could not run Accent without Leslie, and they needed to "do something and just try to stay with the company." Nevertheless, Leslie gave Rogers her two weeks notice. Daniel and Judith also left the company.

In a subsequent email, Rogers denied Leslie's request to transfer her interest to Judith but suggested they position the company for sale, though that would take a few months. On July 9, 2003, when Leslie continued to refuse to stay, Rogers "did a flip and told [Leslie] that he owned [her] and to read [her] contract, babe, and that [she] was not walking away from this company and that he had done this—he just got out of something for 18 months and he ended up on top and [she] better read her contract, that he was going to sue [her]." Rogers said he "was going to take [Leslie's] house and [her] child's college fund and he was going to shove it up [her] ass." Two days later, Accent's accountants contacted Leslie and told her that Burmeister was suddenly providing them with Accent's books and records. The accountants

asked about "these large checks that were being written" from Accent to Conservative Care and Care Affiliates. Daniel searched online and found that both companies were owned by Rogers.

Rogers sent his attorneys to Accent's office to question employees, and Leslie and Daniel contacted attorneys of their own, ultimately filing suit in late July 2003. In their original petition, Daniel, Leslie, and Judith sought a declaratory judgment that the investment agreement was void, and they also brought claims for fraudulent inducement, breach of fiduciary duty, and, if the investment agreement was held to be enforceable, claims for breach of the investment agreement. In his original answer and counterclaim, Rogers maintained that Leslie, Daniel, and Judith owed an ongoing duty of loyalty to Accent and were subject to agreements not to compete with Accent, solicit any of Accent's clients, or reveal any of Accent's confidential information. Rogers alleged Leslie, Daniel, and Judith had breached these duties under the parties' agreement and this threatened to disrupt or destroy Accent's business. In particular, Rogers complained of Leslie, Daniel, and Judith's refusal to sign a formal change of ownership form that would allow Accent to continue its operations and receive payments, including payments for services already rendered. As a result, Rogers sought damages, interest, and attorney's fees.

By July 2004, when Rogers and Burmeister filed their second amended answer, Leslie, Daniel, and Judith had formed Radiant Healthcare Services, L.L.C. which was competing with Accent. Nevertheless, Rogers and Burmeister maintained that Leslie, Daniel, and Judith continued to owe a duty of loyalty to Accent, had agreed not to compete with Accent, and were estopped from challenging the validity of the investment agreement.

In August 2004, Leslie, Daniel, and Judith filed their fifth amended petition in which they maintained their request for declaratory judgment that the investment agreement was void and their claims for fraudulent inducement, common law fraud, conversion and civil theft, civil conspiracy, and breach of fiduciary duty. In the alternative, Leslie, Daniel, and Judith argued that, if the investment agreement was determined to be enforceable, Rogers and Burmeister had breached the agreement.

A jury subsequently entered a verdict in which it found Rogers committed fraud in the inducement and fraud against Leslie, Daniel, and Judith as to the signing of the investment agreement; Burmeister, Care Affiliates, and Conservative Care knowingly participated or knowingly accepted benefits of Rogers' fraud; Leslie, Daniel, and Judith did not waive their right to complain of the fraud in the inducement or fraud; Leslie, Daniel, and Judith each suffered out of pocket damages of $831,203.89 as a result of the fraud in the inducement and fraud; Rogers and Burmeister committed theft in the amount of $359,664 against Leslie, $177,148 against Daniel, and $292,684 against Judith; Rogers and Burmeister were part of a conspiracy that damaged Leslie, Daniel, and Judith; the February 7, 2003 transfer of $100,000 did not comply with the funding commitment in the investment agreement; Leslie, Daniel, and Judith intended to be bound by the investment agreement; Rogers failed to comply with the investment agreement, his failure to comply was not excused, and the resulting damages were $832,000 for Leslie, $416,000 for Daniel, and $832,000 for Judith; exemplary damages of $750,000 against Rogers and $100,000 against Burmeister were appropriate; and Leslie, Daniel, and Judith were entitled to $475,000 in attorney's fees and an additional $150,000 in appellate attorney's fees.

The trial court entered judgment that recounted the jury's verdict and awarded Leslie, Daniel, and Judith $883,259.75 each, representing "actual damages in the amount of $831,203.89 and pre-judgment interest at the rate of five percent...." The judgment also awarded exemplary damages and attorney's fees. In addition, the judgment declared the investment agreement void for a variety of reasons and declared Leslie, Daniel, and Judith to be the "sole and rightful Members" of Accent. This appeal followed.

We first address Rogers' and Burmeister's arguments concerning the existence of a contract between the parties. In the final judgment, the trial court declared the investment agreement between the parties was void for lack of consideration and illusory promises, void as unconscionable, void because it was procured by fraud, and unenforceable for failure of consideration. In their sixth and seventh issues, Rogers and Burmeister argue Leslie, Daniel, and Judith were not entitled to relief under the Declaratory Judgment Act because their cause of action was already mature, and such relief would improperly revise or alter the rights or legal relations between the parties. In Rogers' and Burmeister's eighth, ninth, and tenth issues, they argue Leslie, Daniel, and Judith were not entitled to declaratory relief because the investment agreement was not illusory, unconscionable, or unenforceable for failure of consideration.

■ A declaratory judgment is a remedial action that determines the rights of the parties and affords relief from uncertainty with respect to rights, status, and legal relations. TEX. CIV. PRAC. & REM.CODE ANN. § 37.002(b) (Vernon 1997); *Bright v. Addison,* 171 S.W.3d 588, 606 (Tex.App.-Dallas 2005, pet. dism'd). Declaratory judgment is appropriate only if (1) a justiciable controversy exists as to the rights

and status of the parties; and (2) the controversy will be resolved by the declaration sought. *Park Cities v. Transpo Funding Corp.,* 131 S.W.3d 654, 661 (Tex. App.-Dallas 2004, pet. denied). The existence of another adequate remedy does not bar a party's right to maintain an action for declaratory judgment. *Id.* A trial court has discretion to enter a declaratory judgment as long as it will serve a useful purpose or will terminate the controversy between the parties. *Bright,* 171 S.W.3d at 606.

■ The record shows that Leslie, Daniel, and Judith, throughout their amended pleadings, sought relief under the Declaratory Judgment Act and requested a declaration from the court that the investment agreement was void due to failure of consideration and illusory promises, unconscionability, fraud, indefiniteness, or because the parties failed to close on the agreement. At the same time, Leslie, Daniel, and Judith sought damages for Rogers' and Burmeister's fraud, theft, conspiracy, breach of the investment agreement, and breach of fiduciary duty. However, it appears from the record and the pleadings on file that Leslie, Daniel, and Judith's request for declaratory judgment, while intertwined with their suit for damages, was distinct. The declaratory relief they sought was a declaration that the investment agreement they executed was void and provided Rogers and Burmeister with no contractual claims against them and no rights as to Accent. This declaratory relief was sought in the face of Rogers and Burmeister's pleadings that Leslie, Daniel, and Judith still owed a duty to Accent and were forbidden from competing with Accent by the investment agreement and were liable for damages for violation of the agreement.

This case does not present a situation where a plaintiff's cause of action is ma-

ture and enforceable in a pending suit that involves the same parties and the same issues as alleged in the declaratory judgment action. *See Tucker v. Graham,* 878 S.W.2d 681, 683 (Tex.App.-Eastland 1994, no writ). Further, we cannot conclude declaratory relief in this case was improper because it would improperly revise or alter the rights or legal relations between the parties. The trial court's declaratory relief that the investment agreement was void did not revise or alter the rights or relations between the parties; it served the useful purpose of clarifying the exact nature of the relationship resulting from the void agreement. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.002(b) (Vernon 1997) (purpose of chapter is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations) *Bright,* 171 S.W.3d at 606. Accordingly, we overrule Rogers' and Burmeister's sixth and seventh issues. Further, because relief under the Declaratory Judgment Act was proper, it was within the trial judge's discretion to award attorney's fees. TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997).

■ As to whether the investment agreement was illusory, unconscionable, or unenforceable for failure of consideration, the record shows the investment agreement effectively gave Rogers control over when or if to disburse funds to Accent after closing up to $250,000. An illusory promise is one that fails to bind the promisor because he retains the option of discontinuing performance without notice. *D.R. Horton, Inc. v. Brooks,* 207 S.W.3d 862, 867 (Tex.App.-Houston [14th Dist.] 2006, no pet.). Because Rogers retained the option of discontinuing his performance under the investment agreement, the trial court correctly granted declaratory relief that the agreement was "void for lack of consideration and illusory promises." Be-

cause we conclude the agreement was void for this reason, we need not further address whether the agreement was void for other reasons. We overrule Rogers' and Burmeister's eighth, ninth, and tenth issues.

■ In Rogers' and Burmeister's eleventh, twelfth, thirteenth, fourteenth, and fifteenth issues, they argue there is no evidence to support the jury's findings of fraud, civil theft, fraudulent inducement, breach of contract, or civil conspiracy. In conducting a no-evidence review, appellate courts must view all the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). The elements of fraud are: (1) a material misrepresentation was made; (2) the representation was false; (3) when the representation was made the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation intending that the other party act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998).

■ Here, the record shows Rogers approached Leslie, Daniel, and Judith and indicated he was a C.P.A., had a master's degree in accounting, and had personal contacts with "between fifty and a hundred doctors." Rogers stated Accent was losing $40,000 to $60,000 per week in referrals that he could bring to Accent. Rogers brought forth a term sheet and investment agreement purported to give Rogers eighty percent of the business he brought to Accent and effectively gave Rogers control over when or if to disburse funds to

Accent after closing up to $250,000. Rogers delayed the closing on the agreement because he "didn't have all the financials," and he brought Burmeister in to take over Accent's accounts payable. Leslie added Rogers to the signature card at Accent's bank, and Rogers transferred $95,000 and $34,000 into a Bank One account. However, Rogers did not put Leslie, Daniel, or Judith on the signature card of the Bank One account or give them any access to the Bank One account. Apparently, the Bank One account had $100,000 in it when Rogers transferred the $95,000 from Accent. Rogers withdrew his $100,000 after the transfer and began operating off Accent's funds. After several months of excuses, Rogers provided a balance sheet showing a "Bank One Funding" of $100,000 and a $150,000 "Line for expansion," but the record shows the $100,000 never left Rogers' control, and the $150,000 was never made available to Accent. The balance sheet also, without explanation, showed a $152,181.26 allowance for doubtful accounts. Leslie, Daniel, and Judith ultimately left Accent and undertook the lengthy underlying litigation to recover damages from Rogers and Burmeister.

Viewing all the evidence, it appears Rogers and Burmeister knowingly made false representations to Leslie, Daniel and Judith intending that they would act upon the misrepresentations, and Leslie, Daniel and Judith acted on the misrepresentations and thereby suffered injury. *See Formosa,* 960 S.W.2d at 47. Accordingly, we overrule Rogers' and Burmeister's argument that no evidence supported the jury's finding that they committed fraud. *See City of Keller,* 168 S.W.3d at 827. Because evidence supported the jury's finding of fraud and all relief granted was justified by the finding of fraud, we need not address whether Rogers and Burmeister were also liable for civil theft, fraudulent inducement, breach of contract, or

civil conspiracy. Thus, we will not further address Rogers' and Burmeister's twelfth, thirteenth, fourteenth, and fifteenth issues.

■ In their second, third, and fourth issues, Rogers and Burmeister argue Athickal was not qualified to provide expert testimony concerning damages, his opinions were unreliable, and the damage models he used did not comport with any jury instruction. The decision whether to admit evidence rests within the discretion of the trial court. *E.I. du Pont de Nemours and Co., Inc. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995). A court abuses its discretion when it rules on the admissibility of evidence in an arbitrary or unreasonable manner or without reference to guiding legal principles or rules. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998).

■ Rule 702 provides that a witness who qualifies as an expert because of knowledge, skill, experience, training, or education may testify as an expert if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or resolve an issue of fact. Tex.R. Evid. 702. The offering party must establish that the expert has knowledge, skill, experience, or education regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject. *Broders v. Heise,* 924 S.W.2d 148, 153 (Tex.1996). Once an opposing party objects to proffered expert testimony, the proponent of the witness's testimony bears the burden of demonstrating its admissibility. *See Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718 (Tex.1998).

A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified and (2) the testimony must be relevant and be based on a reliable foundation. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001); *Robinson*, 923 S.W.2d at 556. The trial court makes the initial determination about whether the expert and the proffered testimony meet these requirements. *Wilkins*, 47 S.W.3d at 499; *Robinson*, 923 S.W.2d at 556. The trial court has broad discretion to determine admissibility, and we will reverse only if there is an abuse of discretion. *Wilkins*, 47 S.W.3d at 499; *Robinson*, 923 S.W.2d at 556. In deciding if an expert is qualified, trial courts must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion. *Wilkins*, 47 S.W.3d at 499.

At trial, Pavi Athickal, one of Accent's accountants, testified he has a bachelor of science degree in physics from a university in India, and he passed the charter accountant exam there that had a passage rate of less than five percent. Upon moving to the United States, Athickal obtained a master's of science degree in accounting from the University of Texas at Arlington in 1991 and became a C.P.A. that same year. In 1992, Athickal became a certified managing accountant, which he described as differing from a C.P.A. in that a C.M.A. looks more at "strategic planning, budgeting, cash management evaluation, market value, book value, ... and economics." As a C.P.A., Athickal must take forty hours of continuing education every year.

Athickal began working with Chirayil & Associates, a Dallas accounting firm, in March 1996. Mr. Chirayil, Athickal's partner, had six years' experience as a Medicare auditor. The firm has more than a hundred clients, with approximately ninety of them being home health agencies. In addition to providing complete accounting services, the firm does Medicare consulting, cost reporting, strategic planning, and planning for expansion. When a home health agency wants to buy or sell an agency, the firm consults with the agency. The firm takes financial information and creates monthly financial statements to help agencies gauge their operational efficiency. While Chirayil helped clients primarily with Medicare matters, Athickal concentrated on the "financial and strategic" matters. Specifically, when a client was considering buying or selling an agency, Athickal would review financial statements to arrive at a fair price for the agency.

Although Athickal stated he did not hold himself out as an expert in valuation in the home-health industry, he testified that he advises clients considering selling or buying home-health agencies, including advising on what is a fair price to ask or to pay. He also advises clients going through the Medicare auditing process, advising on what constitutes valid and reasonable costs for Medicare. Moreover, he and his partner provided all the accounting work and financial consulting for Accent from its inception in 2002 until Rogers and Burmeister took over the bookkeeping.

Thus, Athickal's education, training, and experience in accounting and auditing in the field of Medicare-funded home-health agencies, as well as his exposure to business valuation in that specialized field qualified him to testify as an expert on damages in this case. Contrary to Appellants' assertions, Athickal's experience with Accent Home Health from its inception speaks to his qualifications to testify about the charges Rogers and Burmeister were assessing against Accent for the benefit of Conservative Care and Care Affiliates as compared to the customary costs

involved in running this particular business. An expert in fraud was not required for the factfinder to answer the ultimate question whether those charges were fraudulent in this case. Accordingly, we conclude that the trial court did not abuse its discretion in permitting Athickal to testify as an expert on Appellee's alleged damages. *See Wilkins*, 47 S.W.3d at 499; *Robinson*, 923 S.W.2d at 556.

 In assessing the reliability of the foundation of an expert's testimony, the Supreme Court has identified a non-exclusive list of factors—the *Robinson* factors—which can be considered in assessing reliability. *See Gammill*, 972 S.W.2d at 720 (citing *Robinson*, 923 S.W.2d at 557); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Those factors are as follows:

(1) the extent to which the theory has been or can be tested;

(2) the extent to which the technique relies upon the subjective interpretation of the expert;

(3) whether the theory has been subjected to peer review and/or publication;

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6) the non-judicial uses which have been made of the theory or technique.

*Gammill*, 972 S.W.2d at 720 (citing *Robinson*, 923 S.W.2d at 557). The *Gammill* court noted that some situations are not susceptible to scientific analysis, and thus the *Robinson* factors do not strictly govern those instances. *See id.* at 724–726 (distinguishing between "scientific" and "non-scientific" expert testimony). In such cases, the court must consider whether there is too large of an "analytical gap" between the data and the expert's testimony. *Id.* at 726. However, the trial court's role is not to determine the truth or falsity of the expert's opinion. *Robinson*, 923 S.W.2d at 558. Rather, the trial court's role is to make the initial determination whether the expert's opinion is relevant and whether the methods and research upon which it is based are reliable. *Id.* The trial court should ensure that the opinion comports with applicable professional standards outside the courtroom and that it will have a reliable basis in the knowledge and experience of the discipline. *Wilkins*, 47 S.W.3d at 499.

 In arriving at a fair price for an agency, Athickal considered a variety of factors including whether the patients were mainly Medicare or private patients, because with Medicare patients the receivables come in "real fast and there is no bad debt." Other factors included the size of the company, the quality of the patient referral sources, and the quality of the management of the company. By looking at the growth of a company and its efficiency, Athickal was able to arrive at a value for the company. Similarly, by compiling monthly interim cost reports, Athickal was able to help clients improve their profitability.

Chirayil and Athickal signed a consulting contract with Accent in September 2002, and they agreed to "go back and do all the accounting work from the inception." Accent did very well from August to December 2002, growing from thirty-one patients to close to ninety patients. Accent grew on a "phenomenal level compared to other agencies we had in this short period of time." Accent had "already turned a profit in four months." In Athickal's experience, it usually took nine months to a year for a home health agency to turn a profit. Athickal attributed Ac-

cent's success to the excellent management skills of Leslie and Judith. Athickal and his partner continued to generate interim cost reports for Accent through February 2003, but after that they "stopped getting information." As of February 2003, Accent was still performing well. In July 2003, Burmeister forwarded a packet of Accent's financial information to Athickal, who "found some real alarming invoices there."

In preparing to testify as to Accent's damages, Athickal reviewed "thousands of documents," including Accent's books and records, canceled checks, invoices, payroll reports, and records compiled by his accounting firm. Athickal also reviewed Rogers' and Burmeister's testimony. Athickal spent "close to 200 hours" preparing for his own testimony. Among the unauthorized charges to Accent was an "uncollectible" allowance. Athickal testified almost 100 percent of Accent's patients were Medicare patients, and "when you bill Medicare, you get a hundred percent of the money." Athickal traced, among other things, unauthorized payments of $15,000 per month to Conservative Care and broke down the charges by reviewing Accent's various accounts for consulting, accounting, payroll processing, report implementation, and reporting monthly tracking. Athickal was able to obtain all the charges for Conservative Care from different parts of Accent's books and combine them by category for reporting and monthly tracking.

Over the course of approximately a year, Athickal determined that Accent paid about $253,000 to Conservative Care and Care Affiliates, and he included $203,000 of that amount as damages. As to the remaining $50,000, Athickal could not tell whether or not Accent received any services for those amounts, and where Athick-al "had questions," he did not include the amounts as damages.

Regarding Accent's valuation, Athickal compiled Accent's net income through June 30, 2003, added back all the unauthorized charges, and arrived at a restated income. Athickal then "annualized" the restated income amount over a twelve-month period by dividing by six, the number of months included, and multiplying by twelve to arrive at a restated net income for the entire year of 2003. Having determined Accent's net income, Athickal used a multiplier to obtain Accent's actual value. Based on his eight years of experience in sales and purchases of home health agencies, Athickal testified the commonly used multiplier in the agency was between two and four. By multiplying the restated net income times the multiplier and adding the restated income that would have been left in the company, Athickal was able to arrive at a fair market value for Accent. Thus, Athickal's calculations determined a range in Accent's value between $1.3 million to $2.6 million.

In determining the appropriate multiplier, Athickal took various factors into consideration. First, he determined whether the "payer source" was private or Medicare. The more Medicare patients a home health agency had, the higher would be its multiplier. Second, Athickal reviewed the quality of referral sources, doctors, who would send an agency patients. To gauge the quality of referral sources, Athickal looked at the number of patients Accent had from month to month. Athickal created a graph showing that Accent had more patients each month than it did the prior month from August 2002 through February 2003. Athickal testified this indicated the quality of Accent's referral sources was "very good." Third, Athickal looked at the quality of Accent's management, which he determined was also "very good,"

with excellent quality of care and efficient operations. Athickal reviewed "episodes" consisting of sixty-day periods where patients were admitted and given treatment, and Accent billed Medicare for the treatment. The higher the revenue collected from Medicare, Athickal concluded, the higher the quality of management. Accent's "per episode" revenue was "very high" compared to the industry average.

Athickal testified that, based on an analysis of these factors, Accent's multiplier should be 3.3, at the highest end of the range of values. Using this multiplier, Athickal testified that Accent's value as of June 30, 2003, was $2,165,504.88. To this figure Athickal added $328,106.80, representing restated net income that would have been realized by Accent up to June 30, 2003. Thus, Accent's value on June 30, 2003 was actually $2,493,611.68, and this figure represented the amount of out-of-pocket damages, the difference in value of what the plaintiffs parted with and what they received. Athickal went to a website to see if the multiple he used related to any home health agency transactions, but he did not find any home health agency transactions on the website. Instead, Athickal based the multiplier on his training, education, and continuing consultation with clients over the course of eight years. While Athickal testified he did not hold himself out as an expert in valuation, he further testified he was "an expert in home health valuation" because he had "acquired enough knowledge." Rogers and Burmeister did not offer expert testimony controverting Athickal's testimony. Having reviewed the record, we conclude Athickal's experience, coupled with his thorough testimony about the methodology he employed, demonstrate that the opinions he drew from the underlying data are reliable. *See Wilkins*, 47 S.W.3d at 501.

As to whether Athickal's damage models comported with the jury instruction concerning damages, Athickal testified the damage model he used showed $2,493,611.68 in out-of-pocket damages. Question number three of the jury charge asked whether Rogers and Burmeister committed fraud and defined fraud in accordance with the definition in *Formosa*. *See Formosa*, 960 S.W.2d at 47. Question number four of the jury charge asked the jury what sum of money would fairly and reasonably compensate Leslie, Daniel, and Judith for their out-of-pocket damages resulting from the fraud of Rogers and Burmeister. Out-of-pocket damages were defined as "The difference, if any, between the value of what the plaintiff parted with and the value of what the plaintiff actually received." The jury answered that Leslie, Daniel, and Judith were each entitled to $831,203.89, representing one-third each of the $2,493,611.68, as out-of-pocket damages resulting from the fraud of Rogers and Burmeister. We conclude Athickal was qualified to provide expert testimony concerning damages, his opinions were not unreliable, and his damage models did comport with the jury instruction concerning damages. We overrule Rogers' and Burmeister's second, third, and fourth issues.

In Rogers' and Burmeister's first and fifth issues, they argue no evidence supported the award of damages on any of Leslie, Daniel, and Judith's claims, and even if there was competent evidence of damages, Leslie, Daniel, and Judith lacked standing to recover damages recovered by a corporation. In Rogers' and Burmeister's eighteenth issue, they argue the evidence is factually insufficient to support the damages award because the award is excessive. In Rogers' and Burmeister's sixteenth issue, they argue there is no clear and convincing evidence of fraud that would support a punitive damages award.

As discussed above, sufficient evidence supported the jury's award of damages for Rogers' and Burmeister's fraud, and Athickal presented competent testimony concerning the amount of damages. Further, having reviewed the record, we conclude the amount of damages awarded was not against the overwhelming weight of the evidence such that the award was clearly wrong and unjust. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998). In reviewing the evidence for legal sufficiency under the clear and convincing standard, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true. *Bright v. Addison,* 171 S.W.3d 588, 604 (Tex.App.-Dallas 2005, pet. dism'd). Viewing Athickal's testimony and the record as a whole, we conclude Rogers' and Burmeister's fraud was established by clear and convincing evidence such that an award of punitive damages was appropriate. *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.003(a)(1) (Vernon Supp.2006); *Chu v. Hong,* 185 S.W.3d 507, 513 (Tex.App.-Fort Worth 2005, no pet.).

Rogers and Burmeister argue that, even if there was competent evidence of damages, Leslie, Daniel, and Judith lacked standing to recover damages recovered by a corporation. Article 5.14(L) of the business corporation act provides that a derivative proceeding by a shareholder of a closely held corporation may be treated by a court as a direct action brought by the shareholder for his own benefit, and a recovery in a direct or derivative proceeding by a shareholder may be paid either directly to the plaintiff or to the corporation. Tex. Bus. Corp. Act Ann. art. 5.14(L) (Vernon 2003). A closely held corporation means a corporation with less than thirty-five shareholders that has no shares listed on a national securities exchange or regularly quoted in an over-the-counter market by one or more members of a national securities association. *Id.*

At trial, Rogers' counsel argued that Leslie, Daniel, and Judith lacked "standing to assert the damages alleged in this case and said damages belong to Accent Home Health who has been severed." The parties had previously discussed at length the applicability of article 5.14(L), and the trial court overruled the objection that Leslie, Daniel, and Judith lacked standing. The court's charge asked the jury to determine fair compensation to Leslie, Daniel, and Judith for Rogers' and Burmeister's fraud, and the trial court entered its final judgment awarding damages the jury determined were out-of-pocket damages resulting from Rogers' and Burmeister's fraud.

The record shows Accent's shareholders were Leslie, Daniel, and Judith. There is no evidence in the record that Accent had shares listed on a national securities exchange or regularly quoted in an over-the-counter market by one or more members of a national securities association. Under these circumstances, we conclude the trial court did not err in allowing Leslie, Daniel, and Judith to proceed under article 5.14(L). *See id.* We overrule Rogers' and Burmeister's first, fifth, sixteenth, and eighteenth issues.

In Rogers' and Burmeister's seventeenth issue, they argue the trial court erred in admitting the testimony of Johann van Beest, Rogers' prior business partner. Rogers and Burmeister argue the admission of Van Beest's testimony was irrelevant and prejudicial, and its admission constituted reversible error. The admission and exclusion of evidence is committed to the trial court's sound discretion. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). A person seeking to reverse a judgment based on evidentiary error need not prove that but

for the error a different judgment would necessarily have been rendered, but only that the error probably resulted in an improper judgment. *Id.* A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *Id.* at 753–54.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." Tex.R. Evid. 401. All relevant evidence is admissible unless it is shown that the evidence should be excluded for some other reason. Tex.R. Evid. 402. Evidence of other wrongs or acts is generally not admissible to prove the character of a person in order to show action in conformity therewith. Tex.R. Evid. 404(b). However, such evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.*

█ Van Beest testified he had also sued Rogers and Burmeister for fraud under circumstances very similar to those in the underlying case. Specifically, van Beest testified he was partners with Dr. Rosenstein and Rogers' brother in 1998. Although the three partners' interests totaled one hundred percent of ownership of the partnership, Rogers later became involved in the partnership's affairs. Rogers thereafter presented a document transferring a one percent interest in the partnership to himself. Van Beest and Rosenstein signed the document because Rogers said "we need to have this to make sure that the bank papers and the other papers are in order."

Initially, the partnership had two accounts at Frost Bank. The "upper account" received the partnership's income, and two signatures were required to transfer funds out of the upper account. The "lower account" received funds from the upper account and only required one signature to transfer funds out of the lower account. The lower account was used to pay the day-to-day expenses of the partnership. Rogers changed this arrangement by arranging for the partnership's funds to be deposited in Bank One and closing the upper account when it became empty. Van Beest asked Rogers about the change, and Rogers said he "just had a better arrangement with Bank One." Van Beest was never placed on the signature card at Bank One. Van Beest and Rosenstein ultimately sought dissolution of the partnership by a formal letter, but they learned Rogers had sold the partnership six days before the letter went out. Van Beest and Rosenstein sued Rogers and, in the course of the lawsuit, obtained access to the partnership's books and records. The records showed a $75,000 transfer to Rogers' company Care Affiliates and other transfers of funds to Rogers and Burmeister. Having reviewed van Beest's testimony, we conclude the testimony was admissible as proof of Rogers and Burmeister's motive in seeking involvement with Accent, their intent to commit fraud by association with Accent, and their plan for gaining control over Accent's financial affairs and siphoning off Accent's assets. *See* Tex.R. Evid. 404(b); *see Buck v. Rogers,* 709 S.W.2d 283, 287–88 (Tex.App.-Corpus Christi 1986, no writ). We overrule Rogers' and Burmeister's seventeenth issue.

█ In Rogers' and Burmeister's nineteenth issue, they argue, as they did at trial, that the trial court's judgment violated the election-of-remedies doctrine. Specifically, they argue the trial court did not limit Leslie, Daniel, and Judith's recovery to one theory of recovery. Instead, they

argue, the trial court erred in basing its award on fraud and at the same time declaring the investment agreement void. They argue that a party who has been induced to enter into a contract by fraud may sue to rescind the contract or sue for damages, but not both. In either case, they argue, a plaintiff may recover attorney's fees only if provided for by statute or contract and may not recover attorney's fees for fraud. We conclude these assertions lack merit.

The one-satisfaction rule prohibits a plaintiff from recovering twice for a single injury. *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex.2000); *Emerson Elec. v. American Permanent Ware*, 201 S.W.3d 301, 314 (Tex.App.-Dallas 2006, no pet.). The rule applies when defendants commit the same acts as well as when defendants commit technically differing acts that result in a single injury. *Casteel*, 22 S.W.3d at 390; *Emerson*, 201 S.W.3d at 314. The fact that more than one defendant may have caused the injury or that there may be more than one theory of liability does not modify this rule. *Emerson*, 201 S.W.3d at 314. Whether the rule applies is not determined by the cause of action, but by the injury. *Id.*

Initially, we note the trial court's declaratory judgment held the investment agreement at issue was void. Thus, this case does not involve a party who was successfully "induced to enter into a contract by fraud." *Cf. Dallas Farm Mach. Co. v. Reaves*, 158 Tex. 1, 307 S.W.2d 233, 238–39 (Tex.1957) (party who bought tractor based on fraudulent misrepresentations had choice of standing by bargain and recovering damages for fraud or rescind contract, return thing bought, and receive back what he paid). Instead, this case involved a course of fraud that led up to a void investment agreement. Nevertheless, Rogers and Burmeister attempted to use the void agreement against Leslie, Daniel, and Judith and claimed the void agreement prevented them from competing with Accent. To eliminate any basis for Rogers' and Burmeister's continued attempts to use the investment agreement against them, Leslie, Daniel, and Judith sought declaratory relief that the investment agreement was void. At the same time, Leslie, Daniel, and Judith sought damages for the fraud that had deprived them of their company, Accent.

We have determined that Athickal's testimony and the record as a whole established by clear and convincing evidence that Rogers and Burmeister committed fraud against Leslie, Daniel, and Judith. The trial court awarded out-of-pocket damages for fraud, as determined by the jury, and declared the investment agreement void. Even if a contract is void, a party may recover out-of pocket damages for fraud associated with the unenforceable contract. *See Haase*, 62 S.W.3d at 800. At the same time, declaratory judgment that the investment agreement was void was proper "whether or not further relief is or could be claimed" for Rogers' and Burmeister's fraud. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.003(a) (Vernon 1997). Accordingly, we conclude the trial court limited Leslie, Daniel, and Judith's recovery to their out-of-pocket damages for fraud and correctly declared the investment agreement void, and the resolution of these distinct claims did not violate the one satisfaction rule. *See Casteel*, 22 S.W.3d at 390; *Emerson*, 201 S.W.3d at 314. As to attorney's fees, it was within the trial judge's discretion in the underlying declaratory judgment proceeding to award attorney's fees. TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997); *see Bright*, 171 S.W.3d at 606. We

overrule Rogers' and Burmeister's nineteenth issue.

We affirm the trial court's judgment.