Opinion filed March 27, 2008











 
 
  
 
 







 
 
  
 
 




Opinion filed March 27,
2008

 

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                 ____________

 

                                                          No. 11-06-00172-CV 

                                                     __________

 

MARK SWANK AND JAMES J. McCOY, JR., INDIVIDUALLY AND
IN THEIR DERIVATIVE CAPACITY ON BEHALF OF AUTOMATED MARINE PROPULSION SYSTEMS,
INC., Appellants

                                                             V.

                          LLOYD
R. CUNNINGHAM ET AL, Appellees

 



 

                             On
Appeal from the 61st District Court

                                            Harris
County, Texas

                                  Trial
Court Cause No. 2005-36985

 



 

                                                                   O
P I N I O N








This
is essentially a legal malpractice case brought by Mark Swank and James McCoy,
Jr. against their attorneys and other attorneys involved in the underlying case
of Swank v. Sverdlin, 121 S.W.3d 785 (Tex. App.CHouston [1st Dist.] 2003, pet. denied).  In
this cause, Swank and McCoy alleged claims for legal malpractice, breaches of
fiduciary duties, conspiracy, conversion, and fraud.   

The
underlying litigation involved a dispute over control of Automated Marine
Propulsion Systems, Inc. (AMPS), a company founded by Anatoly Sverdlin and one
in which he initially owned 100% of the stock.  In that suit, Sverdlin
individually and derivatively on behalf of AMPS sued Swank, McCoy, the
directors of AMPS, others who had invested in AMPS, and the law firm for AMPS. 
After Sverdlin obtained a substantial jury verdict against all of the
defendants, Sverdlin settled his individual and derivative claims against
Gardere, Wynne, Sewell & Riggs (the law firm that had represented AMPS when
the investors loaned it $2 million) and its partner David Jungman (Gardere
Wynne).  Ultimately, the  judgment of the trial court in Swank v. Sverdlin
was reversed, and the court of appeals rendered a take-nothing judgment against
Sverdlin on all his claims against the non-settling defendants.  121 S.W.3d
785.

In
this suit, Swank and McCoy are complaining about the failure of AMPS to receive
a portion of the $20 million settlement paid by Gardere Wynne to Sverdlin. 
Because their complaint rests on an assumption that AMPS had a valid jury
verdict against Gardere Wynne, Swank and McCoy must show that they were
stockholders of AMPS to maintain their derivative claims.  Swank and McCoy had
been granted options by Sverdlin on his AMPS stock.  They attempted to exercise
those options.  However, Sverdlin refused to comply with the option contracts,
and there is no evidence that Sverdlin ever delivered the AMPS stock to them.

In
this cause, the trial court below granted summary judgments in favor of all the
appellee attorneys.  Because Swank and McCoy have no standing and because, even
if they had standing, their claims lack merit, we affirm.

                                                             Parties
to this Appeal








Appellants,
Swank and McCoy, were defendants in the underlying litigation.  There are five
groups of appellees in this cause: (1) Aubrey Calvin and John L. Verner and
their law firm of Calvin, Gibbs & Verner (Calvin Verner) represented Swank
and McCoy and some of the other defendants in the underlying litigation; (2)
Mike Malone and his law firm of Battle Fowler, L.L.P. (Battle Fowler) were
listed as being Aof
counsel@ to Calvin
Verner in the underlying litigation; (3) Lloyd R. Cunningham and Marti Batson
and their law firm of the Cunningham Law Group and Kevin McEvily, Jr. and
Richard L. Flowers, Jr. and their law firm of McEvily & Flowers (the
Cunningham Group) represented Sverdlin individually and in his representative
capacity on behalf of AMPS in the underlying litigation; (4) Beck, Redden &
Secrest (Beck Redden) was substituted as counsel for Swank after the jury
reached its verdict in the underlying litigation; and (5) Larry Veselka and
Craig Smyser and their law firm of Smyser, Kaplan & Veselka L.L.P. (Smyser
Kaplan) were substituted as counsel for McCoy after the jury reached its
verdict in the underlying litigation.

Background
Facts

Anatoly
Sverdlin, an engineer from Russia, established AMPS in Houston to repair diesel
marine engines on large ships.  Initially, Sverdlin was the sole owner and
chief executive officer of AMPS.  He subsequently developed and obtained
patents for a new fluid control injection system (FCIS), which allegedly
improved engine efficiency and lowered costs.  Sverdlin then decided to phase
out of the engine repair business and concentrate on marketing the new FCIS.

After
shifting away from engine repairs, AMPS began to operate at a loss, losing over
$125,000 in 1995.  Early in 1995, AMPS hired McCoy as vice president of
industrial sales and Swank as president.  Swank was to develop a business plan
to attract investors for AMPS.  As an incentive, Sverdlin granted Swank and
McCoy options on some of his shares of AMPS=s
stock.  These stock options gave Swank and McCoy an opportunity to each own up
to twenty percent of AMPS.

McCoy
introduced Sverdlin to an investor, Marvin Chudnoff, who in turn recruited
additional investors.  Chudnoff and three other individuals created AMPS
Investment, L.L.C.  AMPS Investment then created L.D.E. Associates, L.L.C.
(LDE), which was the entity through which AMPS Investment and Louis Dreyfus
Natural Gas Holdings Corp. (LDNGH) invested in AMPS.  Jeffrey Sussman of AMPS
Investment signed documents as LDE=s
president.  There were lengthy negotiations for AMPS to obtain a $2 million
loan from LDE to continue development and marketing of the FCIS.  As president
of AMPS, Swank often spoke on behalf of AMPS, and he hired Gardere Wynne to
represent AMPS in the loan transaction.  Sverdlin and his wife, who were the
directors of AMPS at the time, signed a statement giving the AMPS board=s approval to an initial
June 1996 letter agreement for the loan, and later Sverdlin signed the final
loan documents.  The loan agreement was finalized in September 1996, and it
gave LDE the right to choose two of the three directors.  LDE chose Chudnoff
and Sussman.








Unfortunately,
the FCIS did not function as expected.  AMPS lost money, and the parties began
to disagree on how AMPS should be run.  Sverdlin believed that the board of
directors had stopped listening to him and that the board was taking control of
AMPS, causing it to become unmanageable. Sverdlin threatened to fire Swank and
McCoy and take back his patents.  Swank and McCoy attempted to exercise their
stock options in AMPS,[1] but there is
no evidence that Sverdlin ever endorsed or transferred any of his AMPS shares
to them.  The AMPS board decided that Sverdlin was damaging the company in
violation of his employment agreement and terminated his employment in January
1997.  AMPS had been operating at a loss.  AMPS=s
net income after taxes in 1996 revealed over half a million dollars in losses. 
To continue operations, AMPS borrowed additional money directly from LDNGH.

AMPS
and LDE obtained a temporary injunction against Sverdlin to keep him away from
AMPS and its customers.  Sverdlin filed a counterclaim individually and on
behalf of AMPS in his derivative capacity seeking declaratory relief and
alleging numerous causes of action, including fraud, breach of contract, breach
of fiduciary duty, negligence, gross negligence, conspiracy, tortious
interference, and usury.  Sverdlin also sought declaratory relief that he was
the 100% owner of AMPS.  Subsequently, the trial court modified the injunction
to freeze all of the parties=
contractual rights and appointed a receiver to oversee AMPS=s operations.  The trial
court then realigned the parties by making Sverdlin the plaintiff in his
individual capacity and in his derivative capacity on behalf of AMPS.

            The
defendants in the first trial were AMPS, McCoy, Swank, Chudnoff, Sussman,
LDNGH, LDE, and Gardere Wynne.  Sverdlin, in his individual capacity, sued
Gardere Wynne alleging malpractice based on conflicts of interest.  Sverdlin
also asserted derivative claims against Gardere Wynne but did not sue the firm
derivatively for malpractice.  Except for Gardere Wynne, which was represented
by Fulbright & Jaworski, all of the defendants were represented by Calvin
Verner.  Battle Fowler was listed as being Aof
counsel@ to Calvin
Verner.  During the first trial, the Cunningham Group represented Sverdlin
individually and in his representative capacity.

After
a six week jury trial, the jury awarded approximately $1.5 billion to Sverdlin
and  AMPS (on Sverdlin=s
derivative claims).  After the verdict but before the judgment was entered,
there were a number of changes in the defendants=
legal representation:

Calvin Verner
withdrew as counsel for Swank, McCoy, Chudnoff, Sussman, and LDNGH.








Beck Redden was
substituted as counsel for Swank.

 

Smyser Kaplan was
substituted as counsel for McCoy.

 

Brendan Sullivan,
John Buckley, Jr., and David Keltner were substituted as counsel for LDNGH.

 

Calvin Verner
continued to serve as counsel for LDE and AMPS, and Jack O=Neill was added as counsel
for LDE.

 

AMPS=s receiver asked for and
received permission to hire Brown, Parker & Leahy as corporate counsel for
AMPS.  The order was signed on December 29, 1998.

 

Even
though Sverdlin had not pleaded a derivative claim on behalf of AMPS for
malpractice against Gardere Wynne, the trial court=s charge included a question asking whether
Gardere Wynne had committed negligence against AMPS.  The jury found that
Gardere Wynne had committed negligence against AMPS.  Against Gardere Wynne,
the jury awarded $24.5 million in damages to Sverdlin individually and $35
million to Sverdlin derivatively on behalf of AMPS as a result of its findings
that Gardere Wynne had been negligent.  Because there were no pleadings to
support the award to AMPS against Gardere Wynne, Lloyd R. Cunningham (Sverdlin=s counsel) then filed a
trial amendment adding a malpractice claim by AMPS against Gardere Wynne.

Before
the judgment was entered, Sverdlin announced that he and Gardere Wynne had
reached a settlement in principle.  Sverdlin agreed to withdraw the trial
amendment that he had filed to add a derivative legal malpractice claim on
behalf of AMPS, and AMPS agreed to relinquish all claims against Gardere
Wynne.  On January 7, 1999, Swank, McCoy, and others filed a joint request for
a fairness hearing on the derivative settlement.  Before the fairness hearing
was held, the court entered an interlocutory judgment on January 13, 1999.  The
interlocutory judgment denied Sverdlin=s
trial amendment on behalf of AMPS, approved the settlement of all claims
against Gardere Wynne, set aside the jury=s
answers relating to the conduct of Gardere Wynne, and adjudged that Sverdlin
take nothing by his claims against Gardere Wynne.  Under the settlement, the
entire $20 million was to be paid to Sverdlin individually.








Prior
to the trial court=s
interlocutory judgment approving the settlement, Smyser Kaplan was successful
in obtaining an order from the trial court to disregard all of the jury=s liability findings
against McCoy.  However, at the fairness hearing on January 25, Lloyd
Cunningham (Sverdlin=s
counsel) argued that the defendants, which included Swank and McCoy, should not
be allowed to object to the fairness to AMPS of any settlement because the jury
had found them to be wrongdoers. No one objected to the settlement.  Near the
end of the fairness hearing, the trial court agreed that the malpractice claim
on behalf of AMPS would not have survived and indicated that it would have set
aside that verdict in any event.  The trial court then found that the
settlement between Sverdlin and Gardere Wynne met Aall the requirements of substantial fairness@ to AMPS and approved the
settlement.

 The
Gardere Wynne settlement agreement required formal ratification by AMPS. 
Brown, Parker & Leahy, the firm selected by the receiver, prepared the
ratification papers and circulated those papers to Sverdlin and the new AMPS
directors who had been elected after the trial court judgment was entered. 
After the trial court had declared that Sverdlin was the 100% owner of AMPS,
Sverdlin had appointed a new board of directors and president of AMPS.  The new
board ratified the settlement and authorized the new president to sign the
settlement agreement.  The new president then executed the settlement
agreement.

After
several post-verdict motions and hearings, the trial court disregarded certain
jury findings, reduced the verdict to approximately $235 million in damages,
returned the patents to Sverdlin, and declared that 100% of AMPS=s stock was owned by
Sverdlin.  On January 25, 1999, the trial court signed a final judgment.  The
judge of the trial court resigned, and the case was transferred to another
trial judge.  After further postjudgment hearings, the judgment was reduced to
approximately $180 million.

Swank,
McCoy, Chudnoff, Sussman, LDE, and LDNGH appealed the $180 million final
judgment.  McCoy also appealed the trial court_s
declaratory judgment ruling that awarded Sverdlin 100% ownership of AMPS. 
Sverdlin in his derivative capacity cross-appealed parts of the judgment that
disregarded the jury=s
findings as to McCoy.  The Houston First Court of Appeals reversed the trial
court Ain all things@ and rendered judgment that
Sverdlin, individually and on behalf of AMPS, take nothing against the
appellants.  Swank, 121 S.W.3d 785.








On
June 3, 2005, Swank filed this suit in his individual capacity and derivatively
on behalf of AMPS against the Cunningham Group, Calvin Verner, Battle Fowler,
and Beck Redden (the law firm that substituted as counsel for him after the
jury reached its verdict in the underlying litigation).  McCoy then intervened
suing the Cunningham Group, Calvin Verner, Battle Fowler, and Smyser Kaplan
(the law firm that substituted as counsel for him after the jury reached its
verdict in the underlying litigation).  Swank and McCoy based all of their
claims on their asserted 40% interest in AMPS (20% each) and claimed that the
attorneys had deprived them of a valuable property right B AMPS=s $35 million judgment
against Gardere Wynne B
when Sverdlin was allowed to receive the entire $20 million Gardere Wynne
settlement and AMPS received none of the settlement proceeds. Swank and McCoy
alleged that the AThirty-Five
Million Dollar property interest was a valuable property right of AMPS and, by
extension, Swank and McCoy (both 20% shareholders).@  They further alleged that their damages included
but were not limited to Athe
loss of AMPS=[s]
$35,000,000.00 jury award and [their] interests in the $20,000,000.00 Gardere
settlement.@  

Smyser
Kaplan and Beck Redden filed motions for summary judgment.  On January 19,
2006, the trial court entered orders granting summary judgment in favor of
Smyser Kaplan against McCoy and in favor of Beck Redden against Swank.  Later,
the Cunningham Group, Calvin Verner, and Battle Fowler filed motions for
summary judgment.  On May 1, 2006, the trial court signed a final judgment
granting summary judgment in favor of the Cunningham Group, Calvin Verner, and
Battle Fowler.  This appeal by Swank and McCoy followed.

                                Swank=s and McCoy=s Claims in this Cause

Swank=s
and McCoy=s claims in
this cause relate to the $20 million Gardere Wynne settlement in the underlying
litigation.  For example, they made the following allegations in their
petition: 

Each of [the
appellee lawyers] breached one or more of the duties they owed to AMPS, Swank,
and McCoy (both 20% shareholders in AMPS), in the handling of [Sverdlin=s] trial amendment [adding
a derivative claim on behalf of AMPS for legal malpractice against Gardere
Wynne], the Gardere [Wynne] settlement, the $20 million settlement proceeds,
and the application of the credit those [settlement] proceeds allowed.

 








In Swank and
McCoy=s appellate
brief, they characterize their claims as being based on Aacts centered around a $20,000,000 settlement
in the prior litigation B
significant claims belonging to AMPS were compromised as part of the
settlement, but AMPS received none of the proceeds of the settlement.@  Essentially, Swank=s and McCoy=s claims boil down to two
propositions. First, they assert that AMPS lost its $35 million jury verdict
and did not receive any proceeds from the Gardere Wynne settlement because the
appellee lawyers either committed negligence or breached their fiduciary
duties.[2]  Second, they
assert that, as 20% shareholders in AMPS, they were damaged because of the
damage to AMPS.

In
their petition, Swank and McCoy alleged that the Cunningham Group breached its
fiduciary duties to AMPS and to them in their capacities as shareholders in
AMPS in the following ways: (a) entering into an agreement with Gardere Wynne
to settle Sverdlin=s
individual causes of action for $20 million conditioned upon the Cunningham
Group withdrawing AMPS=s
trial amendment for legal malpractice against Gardere Wynne post-verdict; (b)
entering into an agreement with Gardere Wynne to settle Sverdlin=s individual causes of
action for $20 million conditioned upon the Cunningham Group settling all of
AMPS=s causes of
action against Gardere Wynne; (c) entering into an agreement with Gardere
Wynne to settle Sverdlin=s
individual causes of action for $20 million conditioned upon the Cunningham
Group agreeing not to authorize or assign the right to maintain a derivative
action against Gardere Wynne on behalf of AMPS; (d) withdrawing AMPS=s trial amendment
post-verdict thereby discharging AMPS=s
$35 million jury verdict against Gardere Wynne; (e) failing to protect AMPS, by
allowing a settlement credit to be assessed against AMPS for the $20 million
received by Sverdlin; (f) failing to protect AMPS=s
settlement proceeds; (g) failing to protect AMPS=s
assets; (h) failing to prevent the sale of AMPS=s
assets; and (i) failing to prevent AMPS=s
dissolution.  Swank and McCoy alleged breach of fiduciary duty claims  B identical to those listed
in (e) through (i) above B
against Calvin Verner and Battle Fowler.  Additionally, Swank and McCoy alleged
that Calvin Verner and Battle Fowler breached their fiduciary duties in failing
to object to and in failing to prevent the Cunningham Group from undertaking
the acts listed in (a) through (d) above.  Swank and McCoy made similar breach
of fiduciary duty allegations against Beck Redden and Smyser Kaplan.













Swank
and McCoy alleged the same acts or omissions as negligence allegations against
Calvin Verner, Battle Fowler, Beck Redden, and Smyser Kaplan.  Specifically,
Swank and McCoy alleged that these four appellees committed negligence in the
same respects: (a) affirmatively consenting to the withdrawal of the trial
amendment; (b) not objecting to the withdrawal of the trial amendment; (c) not
appealing the withdrawal of the trial amendment; (d) not asking the court to
hold all or a portion of the proceeds of the Gardere Wynne settlement in the
court=s registry; (e)
failing to ask the court to have all or a portion of the proceeds of the
Gardere Wynne settlement held by the receiver; (f) failing to seek a writ of
mandamus directing the trial court to hold all or a portion of the proceeds of
the Gardere Wynne settlement in the court=s
registry pending appeal; (g) failing to seek a writ of mandamus directing the
trial court to have all or a portion of the proceeds of the Gardere Wynne
settlement held by the receiver pending appeal; (h) failing to follow Aubrey
Calvin=s advice in his
memorandum dated January 4, 1999; (i) failing to advise them that the Gardere
Wynne settlement proceeds were being diverted away from AMPS; (j) failing to
demand that Gardere Wynne not insist on withdrawal of the trial amendment as a
condition of settlement; (k) failing to demand that Gardere Wynne place the
proceeds of the Gardere Wynne settlement into the court=s registry; (l) failing to demand that Gardere
Wynne place the proceeds of the Gardere Wynne settlement into the hands of the
receiver; (m) failing to demand that the Cunningham Group, the Calvin Group,
and the Battle Fowler Group refrain from withdrawing the trial amendment on
behalf of AMPS; (n) failing to demand that the Cunningham Group, the Calvin
Group, the Battle Fowler Group, and the receiver object to the withdrawal of
the trial amendment; (o) failing to demand that the Cunningham Group, the
Calvin Group, the Battle Fowler Group, and the receiver file a trial amendment;
(p) failing to demand that the Cunningham Group, the Calvin Group, the Battle
Fowler Group, and the receiver appeal the withdrawal of the trial amendment;
(q) failing to demand that the Cunningham Group, the Calvin Group, the Battle
Fowler Group, and the receiver apply for a court order to hold all or a portion
of the proceeds of the Gardere Wynne settlement in the court=s registry; (r) failing to
demand that the Cunningham Group, the Calvin Group, the Battle Fowler Group,
and the receiver ask the court to have all or a portion of the proceeds of the
Gardere Wynne settlement held by the receiver; (s) failing to demand that the
Cunningham Group, the Calvin Group, the Battle Fowler Group, and the receiver
seek a writ of mandamus directing the trial court to order that all or a
portion of the proceeds of the Gardere Wynne settlement be held in the court=s registry; (t) failing to
demand that the Cunningham Group, the Calvin Group, the Battle Fowler Group,
and the receiver seek a writ of mandamus directing the trial court to have all
or a portion of the proceeds of the Gardere Wynne settlement held by the
receiver; (u) failing to object to the settlement of all of AMPS=s claims; (v) failing to
object to the extraction of the settlement credit from AMPS instead of
Sverdlin; and (w) failing to fully protect Swank=s
and McCoy=s interests
in the application of the settlement credit.

In
addition to the above claims, Swank and McCoy alleged that the Cunningham Group
converted AMPS=s  $35
million jury verdict against Gardere Wynne and that Calvin Verner, Battle
Fowler, Beck Redden, and Smyser Kaplan conspired with the Cunningham Group to
convert the jury verdict.  Swank and McCoy also alleged a fraud claim against
Lloyd Cunningham in his individual capacity.  Based on the alleged breaches of
fiduciary duty by all appellee lawyers, Swank and McCoy sought a disgorgement
of legal fees paid to the appellee lawyers.

                                            Appellees= Motions for Summary
Judgment

The
appellee lawyers filed traditional motions for summary judgment.  Smyser Kaplan
moved for summary judgment on the following grounds: (a) McCoy=s derivative claims on
behalf of AMPS failed for two independent reasons: (1) because Smyser Kaplan
never represented AMPS, McCoy lacked standing; and (2) AMPS=s board of directors
expressly ratified the settlement; (b) McCoy=s
Aindividual@ claims failed because the
damages he sought to recover belonged to AMPS; (c) McCoy=s derivative and individual claims failed
because his pleadings and interrogatory answers established that the damages he
sought to recover were impermissibly speculative; and (d) McCoy=s non-malpractice claims
for fee forfeiture and conspiracy failed because they constituted an
impermissible attempt to fracture a legal malpractice claim and, alternatively,
McCoy=s claim for fee
forfeiture failed because he paid no fees and his claim for Aconspiracy to convert the
AMPS verdict@ failed
because a jury verdict cannot be converted.

Beck
Redden moved for summary judgment on the following grounds:  (a) Swank=s derivative claim on
behalf of AMPS failed because Beck Redden never represented AMPS; and
(b) Swank did not allege any direct personal damage and, therefore, his
individual claim failed.  Beck Redden also incorporated by reference into its
motion for summary judgment all of Smyser Kaplan=s
grounds for summary judgment.

The
Cunningham Group moved for summary judgment on the following grounds: (a) the
statute of limitations barred Swank=s
and McCoy=s claims;
(b) Swank and McCoy lacked standing to assert individual or derivative claims
against the Cunningham Group for the following reasons: (1) they had no
standing to assert individual malpractice and breach of fiduciary duty claims
because they were not and had never been in privity with the Cunningham Group;
(2) they had no standing to assert derivative claims on behalf of AMPS because
they were not and had never been shareholders in AMPS; and (3) they had no
standing to assert derivative claims on behalf of AMPS for breach of fiduciary
duty by the Cunningham Group because there was no privity between AMPS and the
Cunningham Group at the time of the Gardere Wynne settlement; (c) collateral
estoppel, ratification, and waiver barred Swank=s
and McCoy=s derivative
claims on behalf of AMPS; (d) there was no evidence of any underlying damage to
AMPS to support the malpractice jury verdict against Gardere Wynne; (e) Swank=s and McCoy=s claims failed because
their damage and causation theories were fatally speculative as a matter of
law; (f) Swank=s and
McCoy=s conversion
claim failed because there can be no conversion of a jury verdict; and (g)
Swank=s and McCoy=s fraud claims against
Lloyd Cunningham failed because there was no evidence that he made any
fraudulent statement upon which they relied to their detriment and because of
which they sustained damages.           Battle Fowler moved for summary
judgment on the following grounds: (a) Battle Fowler ceased representing any
party in connection with the underlying litigation immediately after the jury=s verdict on October 27,
1998, and, therefore, it owed no duty to any party thereafter; (b) there was no
evidence that Battle Fowler represented any party in connection with the
underlying litigation immediately after the jury=s
verdict on October 27, 1998, and in no event after November 4, 1998, and there
was no evidence that Battle Fowler owed any duty to any party thereafter
(Battle Fowler also moved for a no-evidence summary judgment on this ground);
(c) the statute of limitations barred Swank=s
and McCoy=s claims;
(d) there was no evidence of fraudulent concealment on the part of Battle
Fowler sufficient to toll the statute of limitations (Battle Fowler also moved
for a no-evidence summary judgment on this ground); (e) Swank=s and McCoy=s claims were barred by the
doctrines of res judicata and/or collateral estoppel; (f) Swank=s and McCoy=s claims were barred by
AMPS=s ratification of
the Gardere Wynne settlement; (g) Swank=s
and McCoy=s damage and
causation theories were fatally speculative as a matter of law; (h) neither
Swank nor McCoy had standing to bring malpractice or breach of fiduciary duty
claims in their individual capacities; (i) Swank=s
and McCoy=s Aconspiracy to convert@ claims failed because a
verdict cannot be converted and because there was no conspiracy; (j) the
evidence conclusively established that Battle Fowler was not a part of any
alleged conspiracy; (k) there was no evidence that Battle Fowler ever knew of
or participated in any alleged conspiracy (Battle Fowler also moved for a
no-evidence summary judgment on this ground); and (l) neither Swank nor McCoy
could obtain fee disgorgement from Battle Fowler because neither paid any fees
to Battle Fowler.  Battle Fowler filed a second motion in which it moved for a
no-evidence summary judgment on the ground that there was no admissible summary
judgment evidence to support an award of damages to Swank and McCoy
individually and derivatively on behalf of AMPS.








Calvin
Verner moved for a traditional summary judgment on the following grounds: 
(a) Calvin Verner did not represent Swank or McCoy after December 3, 1998,
and, once the directors and shareholders of AMPS retained their own counsel, no
party looked to Calvin Verner for legal advice, counsel, or assistance; (b)
AMPS=s receiver, not
Calvin Verner, controlled any derivative claims on behalf of AMPS; (c) the
statute of limitations barred Swank=s
and McCoy=s claims;
(d) Swank=s and
McCoy=s claims were
barred by AMPS=s
ratification of the Gardere Wynne settlement; (e) Swank=s and McCoy=s
damage and causation theories were fatally speculative as a matter of law; (f)
neither Swank nor McCoy had standing to bring malpractice or breach of
fiduciary duty claims in their individual capacities; (g) Swank=s and McCoy=s Aconspiracy to convert@ claims failed because a verdict cannot be
converted and because there was no conspiracy; and (h) neither Swank nor McCoy
could obtain fee disgorgement from Calvin Verner because neither paid fees to
Calvin Verner.  Calvin Verner moved for a no-evidence summary judgment on the
grounds that there was no evidence of the following matters:  (a) that any
defendant=s alleged
breach of duty was a direct cause of Swank=s
and McCoy=s damages;
(b) that Swank and McCoy sustained any damages whatsoever; (c) that the trial
court would have sustained any objection made to the Gardere Wynne settlement
at the Afairness
hearing@ in the
underlying case; (d) that there was any valid legal basis for an objection to
the Gardere Wynne settlement at the Afairness
hearing@ in the
underlying case; (e) that any evidence would or could have been produced at the
Afairness hearing@ in the underlying case
which would or could have affected the outcome of the Afairness hearing@;
(f) that Sverdlin would have gone forward with the underlying Gardere Wynne
settlement if he had been required to split the money with AMPS; (g) that there
was any Aconspiracy@ between the defendants to
deprive AMPS of any monies from the Gardere Wynne settlement; (h) that, had
AMPS received proceeds from the Gardere Wynne settlement, there would have been
any money left over for any shareholders after AMPS paid its debts to all
outstanding creditors; (i) that the FCIS system which was the subject of the
underlying case would have ever worked; (j) that the shareholders of AMPS would
have reached an agreement on how to spend any portion of the settlement monies;
(k) that Swank and McCoy would have ultimately netted any recovery from any
hypothetical portion of the Gardere Wynne settlement that AMPS would or could
have received; and (l) that Swank and McCoy could have proved the Acase within a case@ on causation or damages
which would have been necessary for them to recover in this legal malpractice
case.

Swank
and McCoy filed responses to appellees=
motions for summary judgment, and the trial court conducted hearings on the
motions.  The trial court granted summary judgments to all appellees without
specifying the ground or grounds upon which it relied in granting the motions. 
In this appeal, Swank and McCoy present forty appellate issues challenging the
trial court=s granting
of summary judgment to appellees.

                                                              Standard
of Review








Where,
as here, a trial court=s
order granting summary judgment does not specify the ground or grounds relied
upon for its ruling, summary judgment will be affirmed on appeal if any of the
summary judgment grounds advanced by the movant are meritorious.  Dow Chem.
Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001); Carr v. Brasher, 776
S.W.2d 567, 569 (Tex. 1989).  A trial court must grant a traditional motion for
summary judgment if the moving party establishes that no genuine issue of
material fact exists and that the movant is entitled to judgment as a matter of
law. Tex. R. Civ. P. 166a(c); Lear
Siegler, Inc. v. Perez, 819 S.W.2d 470, 471 (Tex. 1991).  In order for a
defendant to be entitled to summary judgment, it must either disprove an
element of each cause of action or establish an affirmative defense as a matter
of law. Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex. 1997). 
Once the movant establishes a right to summary judgment, the nonmovant must
come forward with evidence or law that precludes summary judgment. City of
Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678-79 (Tex. 1979). 
When reviewing a traditional summary judgment, the appellate court considers
all the evidence and takes as true evidence favorable to the nonmovant.  Am.
Tobacco Co., 951 S.W.2d at 425; Nixon v. Mr. Prop. Mgmt. Co., 690
S.W.2d 546, 548-49 (Tex. 1985).  The appellate court Amust consider whether reasonable and
fair-minded jurors could differ in their conclusions in light of all of the
evidence presented@
and may not ignore Aundisputed
evidence in the record that cannot be disregarded.@ Goodyear Tire & Rubber Co. v. Mayes,
236 S.W.3d 754, 755, 757 (Tex. 2007).

We
must review a no-evidence summary judgment under the same standard as a
directed verdict.  King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 750-51
(Tex. 2003).  Accordingly, we examine the record in the light most favorable to
the nonmovant and disregard all contrary evidence and inferences.  Id.; Wal-Mart
Stores, Inc. v. Rodriguez, 92 S.W.3d 502, 506 (Tex. 2002).  A trial court
must grant a proper no-evidence motion for summary judgment unless the
nonmovant produces more than a scintilla of probative evidence to raise a
genuine issue of material fact.  Tex. R.
Civ. P. 166a(i); Wal-Mart, 92 S.W.3d at 506.  We may not consider
any evidence presented by the movant unless it creates a fact question.  Binur
v. Jacobo, 135 S.W.3d 646, 651 (Tex. 2004).

                                                                       Standing

The
Cunningham Group moved for a traditional summary judgment on the ground that
Swank and McCoy lacked standing to assert derivative claims on behalf of AMPS
because they were never shareholders in AMPS.  Standing is a component of
subject-matter jurisdiction, and a plaintiff must have standing to maintain a
suit.  Tex. Ass=n
of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 445-46 (Tex. 1993); Spurgeon
v. Coan & Elliott, 180 S.W.3d 593, 597 (Tex. App.CEastland 2005, no pet.). 
Because the Cunningham Group challenged Swank=s
and McCoy=s standing
in a traditional summary judgment, we apply the standard of review that applies
to traditional motions for summary judgment.  Kilpatrick v. Kilpatrick,
205 S.W.3d 690, 700 (Tex. App.CFort
Worth 2007, pet. denied).[3]

A
cause of action against one who has injured a corporation belongs to the
corporation and not to the shareholders.  A corporate stockholder cannot
recover damages personally for a wrong done solely to the corporation, even
though he may be injured by that wrong.  Wingate v. Hajdik, 795 S.W.2d
717, 719 (Tex. 1990).  Thus, a shareholder who seeks individual redress based
on allegations concerning wrongs done to a corporation lacks standing.  Redmon
v. Griffith, 202 S.W.3d 225, 233 (Tex. App.CTyler
2006, pet. denied).








A
cause of action for injury to the property of a corporation or for impairment
or destruction of its business is vested in the corporation, as distinguished
from its shareholders, even though the harm may result indirectly in the loss
of earnings to the shareholders.  Redmon, 202 S.W.3d at 233.  The
individual shareholders have no separate and independent right of action for
wrongs to the corporation that merely result in depreciation in the value of
their stock.  Id.  As a result, to recover for wrongs done to the
corporation, the shareholder must bring the suit derivatively in the name of
the corporation so that each shareholder will be made whole if the corporation
obtains compensation from the wrongdoer.  Id. at 234.  However, a
corporate shareholder may have an individual action for wrongs done to him
where the wrongdoer violates a duty that arises from a contract or otherwise
and that is owed directly by the wrongdoer to the shareholder.  Such a
principle is not so much an exception to the general rule as it is a
recognition that a shareholder may sue for violations of his individual rights
regardless of whether the corporation also has a cause of action.  It is the
nature of the wrong whether directed against the corporation only or against
the shareholder personally and not the existence of injury that determines who
may sue.  Id.  The American Law Institute distinguishes between
derivative actions and direct actions in the following way:

[A]
wrongful act that depletes corporate assets and thereby injures shareholders
only indirectly, by reason of the prior injury to the corporation, should be
seen as derivative in character; conversely, a wrongful act that is separate
and distinct from any corporate injury, such as one that denies or interferes
with the rightful incidents of share ownership, gives rise to a direct action.

Principles of Corporate Governance:  Analysis
and Recommendation '
7.01 cmt. c (2005).

In
this cause, Swank and McCoy alleged claims in their individual capacities and
in their derivative capacities on behalf of AMPS.  Swank=s and McCoy=s
claims in this cause arose from (1) the jury=s
award in the underlying litigation of $35 million derivatively to Sverdlin on
behalf of AMPS against Gardere Wynne and (2) the subsequent settlement of
Sverdlin=s derivative
claim on behalf of AMPS against Gardere Wynne in which AMPS did not receive any
of the settlement proceeds.








AMPS=s claim for negligence
against Gardere Wynne belonged to it and not to its shareholders.  Wingate,
795 S.W.2d at 719; Redmon, 202 S.W.3d at 233.  Swank=s and McCoy=s claims are based on an
alleged injury to AMPS.  They assert that, because of the negligence and
wrongful conduct of the appellee lawyers, AMPS lost its $35 million jury
verdict without receiving anything in return for the loss.  Swank and McCoy
alleged that the injury to AMPS caused injuries to them because they owned
shares of stock in AMPS.  However, a shareholder of a corporation who receives
an indirect injury by reason of a prior injury to the corporation does not have
standing to maintain an individual action for damages.  Redmon, 202
S.W.3d at 233; Section 7.01 cmt. c.  Because Swank=s and McCoy=s
claims depend on an injury to AMPS, their claims are derivative in nature. 
Therefore, they lack standing to seek redress in their individual capacities.  Redmon,
202 S.W.3d at 233.    

We
next address whether Swank and McCoy have standing to assert derivative claims
on behalf of AMPS.  The Cunningham Group presented evidence in support of its
summary judgment ground that Swank and McCoy lacked standing to assert
derivative claims on behalf of AMPS because they were never shareholders in
AMPS.  The Cunningham Group=s
evidence included excerpts from Swank=s
trial testimony in the underlying litigation, an affidavit of Swank that had
been filed in the underlying litigation, and excerpts from Swank=s deposition in this
cause.  Swank=s
testimony and affidavit established the following facts: (1) that Sverdlin told
Swank and McCoy that he would not recognize their stock options; (2) that
Sverdlin repudiated the stock options before Swank and McCoy exercised their
stock options; (3) that Swank exercised his stock option because Sverdlin had
stated that he would not honor the stock option agreements; (4) that Sverdlin represented
to Swank that he would refuse to honor the stock options; and (5) that Swank
did not know whether Sverdlin ever endorsed a share certificate over to McCoy
or him but that Swank believed that Sverdlin never endorsed a stock certificate
over to him.  Swank=s
appellate brief in the underlying litigation stated that, A[k]nowing that Sverdlin was
trying to fire them, Swank and McCoy exercised their options on January 9,
1997.@  McCoy=s appellate brief in the
underlying litigation stated that he exercised his stock option on January 9,
1997.  The Cunningham Group=s
summary judgment evidence established that Sverdlin repudiated the stock
options before Swank and McCoy attempted to exercise them.  The evidence was
sufficient to disprove that Swank and McCoy were shareholders in AMPS;
therefore, the summary judgment burden shifted to Swank and McCoy to come forward with evidence that precluded summary
judgment.  City of Houston, 589 S.W.2d at 678-79.








Swank
and McCoy assert that, in the underlying litigation, the Houston First Court
adjudicated them to be shareholders in AMPS.  Swank and McCoy rely on two
statements in the court=s
opinion.  First, the court stated in the ABackground@ section that ASwank and McCoy exercised
their stock options in AMPS.@ 
See Swank, 121 S.W.3d at 790.  Second, the court stated, while analyzing
Sverdlin=s tortious
interference claim, that Aappellants
had a financial interest in AMPS, including stock, stock options, and loans.@  Id. at 801.  We
note that there were six appellants in the appeal in the underlying
litigation.  Based on these two statements, Swank and McCoy assert that the
court Arecognized that
[they] were shareholders in AMPS.@

In
the underlying litigation, Sverdlin sought a declaratory judgment that he owned
100% of the stock in AMPS.  Sverdlin did not submit a jury issue relating to
his claim that he owned 100% of the stock, and Swank and McCoy did not submit
jury issues relating to their claims that they each owned 20% of the stock. 
However, apparently based on the jury=s
finding that Swank, McCoy, and three of their codefendants had committed fraud
against Sverdlin in connection with Athe
transaction involving his corporate stock,@
the trial court entered a declaratory judgment that Sverdlin owned 100% of the
stock.  The Houston First Court reversed the trial court=s judgment and rendered judgment that Sverdlin
and AMPS take nothing on their claims.  Swank, 121 S.W.3d at 803. 
However, the court did not address the competing claims to ownership of AMPS=s stock in its opinion, and
the court did not render judgment that Swank and McCoy each owned 20% of the
stock in AMPS.  








A
reversal of the trial court=s
declaration that Sverdlin owned 100% of the stock in AMPS is not the same as
holding that Swank and McCoy each owned 20% of the stock in AMPS.  The reversal
of a trial court=s
judgment completely nullifies it, leaving it as if it had never been rendered
other than as to further rights of appeal.  In re S.S.G., 208 S.W.3d 1,
3 (Tex. App.CAmarillo
2006, pet. denied); Flowers v. Flowers, 589 S.W.2d 746, 748 (Tex. Civ.
App.CDallas 1979, no
writ); King v. Cash, 174 S.W.2d 503, 504 (Tex. Civ. App.CEastland 1943, no writ). 
The effect of a reversal of a judgment is to place the parties in the same
position that they occupied before the judgment was rendered by the lower
court.  City of Houston v. Walsh, 66 S.W. 106, 108 (Tex. Civ. App. 1901,
writ ref=d); cf.
P.V. Int=l
Corp. v. Turner, Mason, & Solomon, 700 S.W.2d 21, 22 (Tex. App.CDallas 1985, no writ) (the
effect of setting aside a judgment is to place the parties in the position they
occupied before the rendition of judgment).  After the Houston First Court
reversed the trial court=s
judgment in the underlying litigation, the parties were in the same position
that they were in before the trial court rendered its judgment:  Swank and
McCoy had tried to exercise their stock options, and Sverdlin had refused to
perform his part of the option contract.  Swank and McCoy had a breach of
contract action to establish that they were shareholders in AMPS.

Swank
and McCoy also assert that they presented summary judgment evidence
establishing that, after they exercised their stock options, Sverdlin agreed
that he would honor their exercise of the options.  Specifically, Swank and
McCoy relied on minutes from a special meeting of AMPS=s board of directors on January 9, 1997. 
David Jungman of Gardere Wynne, acting as secretary of the meeting, prepared
the minutes.  Jungman stated the following:  AMr.
Swank notified the Board that he and James McCoy had exercised their options to
purchase stock in [AMPS] from Mr. Sverdlin.  Mr. Sverdlin said that he accepted
the exercise of the options and that he would act pursuant to such
notifications.@ 
Sverdlin=s statement
that he would act pursuant to the notifications was, at most, a promise to do
something in the future.  The fact that Sverdlin indicated that he would honor
Swank=s and McCoy=s exercise of their stock
options is no evidence that he performed his part of the option contract. 
There was no summary judgment evidence that Sverdlin ever endorsed any stock
over to Swank or McCoy.

Swank
and McCoy=s summary
judgment evidence failed to raise a fact issue on whether they owned stock in
AMPS.  Therefore, Swank and McCoy lack standing to maintain this suit, and the
trial court did not err in granting summary judgment to the Cunningham Group on
the ground that Swank and McCoy lacked standing to assert derivative claims on
behalf of AMPS.  Swank=s
and McCoy=s lack of
standing also precludes them from maintaining their claims against the other
appellees; therefore, the trial court did not err in granting summary judgment
to all appellees based on the lack of standing.[4]                            









Even
assuming that Swank and McCoy were shareholders in AMPS, they would lack 
standing in their individual capacities to assert claims belonging solely to
AMPS.  As explained above, Swank=s
and McCoy=s claims are
derivative in nature.  Texas statutory law specifically provides for
shareholder derivative proceedings in Tex.
Bus. Orgs. Code Ann. ''
21.551-.563 (Vernon Pamph. 2007), formerly Tex.
Bus. Corp. Act art. 5.14 (2003).[5]  Sections
21.552 through 21.559 set forth a number of procedural requirements for
maintaining a derivative action, such as the requirement in Section 21.553 that
a shareholder make a written demand on the corporation to take suitable
action.  Section 21.563 is entitled AClosely
Held Corporation@ and
applies to corporations that have (1) fewer than thirty-five shareholders and
(2) no shares listed on a national securities exchange or regularly quoted in
an over-the-counter market by one or more members of a national securities
association.  Section 21.563(b) provides that the procedural requirements for
maintaining derivative proceedings set forth in Sections 21.552 through 21.559
do not apply to closely held corporations.  Section 21.563(c) provides as
follows:

(c)
If justice requires:

(1)
a derivative proceeding brought by a shareholder of a closely held corporation
may be treated by a court as a direct action brought by the shareholder for the
shareholder=s own
benefit; and

 

(2)
a recovery in a direct or derivative proceeding by a shareholder may be paid
directly to the plaintiff or to the corporation if necessary to protect the
interests of creditors or other shareholders of the corporation.

 








Swank and McCoy
argue that, pursuant to Section 21.563, they have standing in their individual
capacities to assert derivative claims belonging to AMPS.  Appellees argue that
Section 21.563 merely removes the procedural requirements for maintaining a
derivative action and, therefore, that Section 21.563 does not confer standing
to Swank and McCoy in their individual capacities to assert claims belonging to
AMPS.  The plain language of the statute does more than remove the procedural
requirements for maintaining a derivative action.  Section 21.563(b) removes
the procedural requirements, and then Section 21.563(c) further provides that
the trial court may treat a derivative proceeding as a direct action by the
shareholder for the shareholder=s
own benefit and may award a recovery in a derivative proceeding directly to the
shareholder.  Thus, under Section 21.563(c), the trial court has discretion to
award damages in a derivative proceeding directly to the shareholder.[6] 
A trial court=s
decision to treat an action as a direct action under Section 21.563(c) so as to
allow recovery to be paid directly to a shareholder plaintiff, as opposed to
the corporation, does not mean that the action is no longer a derivative
proceeding. See DDH Aviation v. Holly, No. Civ.A.3:02-CV-2598-P, 2005 WL
770595, *4 (N.D. Tex. 2005).

At
oral argument before this court, Swank and McCoy relied on Rogers v.
Alexander, 244 S.W.3d 370 (Tex. App.CDallas
2007, no pet.).  In Rogers, Daniel Alexander, Leslie Alexander, and
Judith Pucci were the three shareholders in Alexander & Pucci, L.L.C. d/b/a
Accent Home Health (Accent).  Id. at 388.  Daniel, Leslie, and Judith
brought suit in their individual capacities seeking to recover damages to
themselves and damages to Accent.  The suit arose out of James Rogers=s agreement to invest in
Accent.  Daniel, Leslie, and Judith alleged various claims against four
defendants, including claims of fraud, theft, and breach of fiduciary duty
against Rogers.  At trial, Rogers=s
counsel raised an objection that Daniel, Leslie, and Judith lacked standing to
assert claims for damages that belonged to Accent.  Id.  The trial court
overruled the objection.  Id.  The jury awarded substantial damages to
Daniel, Leslie, and Judith, and the trial court entered judgment in accordance
with the jury=s verdict. 
Id. at 380-81.

On
appeal, the Dallas Court of Appeals addressed whether the trial court had erred
in allowing Daniel, Leslie, and Judith to proceed with their suit under Article
5.14(L) of the Business Corporation Act (now Section 21.563(c) of the Business
Organizations Code).  In Rogers, the record showed that Accent=s only shareholders were
Daniel, Leslie, and Judith.  Rogers, 244 S.W.3d at 388.  Also, there was
no evidence that Accent did not fall within the definition of a closely held
corporation under Article 5.14(L).  Id.  Based on these two
circumstances, the court concluded that the trial court had not erred in
allowing the shareholders to proceed with the suit under Article 5.14(L). 
Id.








This
case is distinguishable from Rogers.  In Rogers, all three of the
shareholders in the limited liability company brought the suit, and no disputes
existed among the shareholders.  In this case, Swank and McCoy each claim to
own 20% of the shares in AMPS.  Even under this scenario, Sverdlin would own
60% of AMPS.  To the extent that Swank and McCoy as shareholders in AMPS would
be able to recover damages in this cause, Sverdlin (as a shareholder in AMPS)
might also be able to recover damages.  Section 21.563(c)(1) of the Business
Organizations Code provides that, if justice requires, the trial court has
discretion to treat a derivative proceeding brought by a shareholder of a
closely held corporation as a direct action brought by the shareholder for the
shareholder=s own
benefit.  Section 21.563(c)(2) provides that, if justice requires, the trial
court has discretion to allow the recovery in a derivative action to be paid
(1) directly to the shareholder or (2) to the corporation if necessary to
protect the interests of creditors or other shareholders.  The record contains
thousands of pages documenting the substantial and longstanding disputes that
have existed between Swank and McCoy on the one hand and Sverdlin on the other
hand.  Under the circumstances in this cause, the trial court could reasonably
have concluded (1) that justice did not require it to treat this suit as a
direct action and (2) that it would have been necessary that any recovery be
paid to AMPS to protect the interests of Sverdlin.  Therefore, even if Sverdlin
owned only 60% of the stock in AMPS, we conclude that the trial court did not
abuse its discretion in refusing to allow Swank and McCoy to proceed with this
cause in their individual capacities under Section 21.563(c).

Swank
and McCoy lack standing to assert derivative claims on behalf of AMPS against
Beck Redden and Smyser Kaplan for an additional reason.  After the jury issued
its verdict in the underlying litigation, Beck Redden represented Swank and
Smyser Kaplan represented McCoy.  Beck Redden and Smyser Kaplan did not
represent AMPS and, therefore, were never in privity with AMPS.  Texas does not
recognize a cause of action for legal malpractice asserted by a party not in
privity with the offending attorney.  Barcelo v. Elliott, 923 S.W.2d
575, 577-78 (Tex. 1996); Gamboa v. Shaw, 956 S.W.2d 662, 664 (Tex. App.CSan Antonio 1997, no
pet.).  Because no privity existed between AMPS and Beck Redden or Smyser Kaplan,
AMPS had no claim for legal malpractice against Beck Redden and Smyser Kaplan.








Similarly,
AMPS=s lack of privity
with Beck Redden and Smyser Kaplan precludes it from asserting breach of
fiduciary duty claims against them.  Fiduciary duties arise when an
attorney-client relationship is created.  Meyer v. Cathey, 167 S.W.3d
327, 330 (Tex. 2005); Greene=s
Pressure Treating & Rentals, Inc. v. Fulbright & Jaworski, L.L.P.,
178 S.W.3d 40, 43 (Tex. App.CHouston
[1st Dist.] 2005, no pet.).  An attorney-client relationship did not exist
between Beck Redden or Smyser Kaplan and AMPS.  In the absence of an
attorney-client relationship, Beck Redden and Smyser Kaplan did not owe
fiduciary duties to AMPS, and AMPS could not recover on a breach of fiduciary
duty claim against them.

AMPS
had no claim for legal malpractice or breach of fiduciary duty against Beck
Redden and Smyser Kaplan.  Therefore, Swank and McCoy lack standing to assert
derivative claims on behalf of AMPS against Beck Redden and Smyser Kaplan.

For
the reasons stated above, Swank and McCoy lack standing to assert claims
belonging to AMPS in their individual capacities, and they also lack standing
to assert derivative claims on behalf of AMPS.  Based on Swank=s and McCoy=s lack of standing, the
trial court did not err in granting summary judgment to appellees.        

                                                          Causation
and Damages

Appellees
moved for traditional summary judgments on the ground that Swank=s and McCoy=s causation and damages
theories were fatally speculative as a matter of law.  To prevail on a legal
malpractice claim, a plaintiff must show (1) that the attorney owed the
plaintiff a duty, (2) that the attorney breached that duty, (3) that the
breach proximately caused the plaintiff=s
injuries, and (4) that damages occurred.  Alexander v. Turtur & Assocs.,
Inc., 146 S.W.3d 113, 117 (Tex. 2004).  On a breach of fiduciary duty
claim, while a plaintiff need not prove causation to recover disgorgement of
fees, the plaintiff must prove causation to recover actual damages.  Hoover
v. Larkin, 196 S.W.3d 227, 233 (Tex. App.CHouston
[1st Dist.] 2006, pet. denied).

The
causal nexus requirement is met when a jury is presented with pleading and
proof that establishes a direct causal link between the damages awarded, the
actions of the defendant, and the injury suffered.  Haynes & Boone v.
Bowser Bouldin, Ltd., 896 S.W.2d 179, 181 (Tex. 1995); Texaco, Inc. v.
Phan, 137 S.W.3d 763, 774 (Tex. App.CHouston
[1st Dist.] 2004, no pet.).  Proximate cause consists of two elements: (1)
cause in fact and (2) forseeability.  Western Inv., Inc. v. Urena,
162 S.W.3d 547, 551 (Tex. 2005).  These elements cannot be established by mere
conjecture, guess, or speculation.  Doe v. Boys Clubs of Greater Dallas,
Inc., 907 S.W.2d 472, 477 (Tex. 1995).  The test for cause in fact is
whether the act or omission was a substantial factor in causing the injury
without which the harm would not have occurred.  Marathon Corp. v. Pitzner,
106 S.W.3d 724, 727 (Tex. 2003).








A
party cannot recover damages that are based on speculation or conjecture.  Citizens
Nat=l Bank v.
Allen Rae Invs., Inc., 142 S.W.3d 459, 482 (Tex. App.CFort Worth 2004, no pet.). 
Uncertainty as to the fact of legal damages is fatal to recovery.  McKnight
v. Hill & Hill Exterminators, Inc., 689 S.W.2d 206, 207 (Tex. 1985). 
Thus, if damages are too remote, too uncertain, or purely conjectural, they
cannot be recovered.  Arthur Andersen & Co. v. Perry Equip. Corp.,
945 S.W.2d 812, 816 (Tex. 1997).  When damages are based on Aspeculation upon
speculation,@ summary
judgment is appropriate.  Reardon v. Lightpath Techs., Inc., 183 S.W.3d
429, 439 (Tex. App.CHouston
[14th Dist.] 2005, pet. denied).

Swank
and McCoy alleged that the Gardere Wynne settlement resulted in damages to
them.  Swank and McCoy identified their damage theories in their answers to
interrogatories.  Swank stated that he sought to recover the following damages:

a. Mark Swank[=s] damages consist of 20%
of the $35 million AMPS jury verdict, or $7 million.

or,

b. Anatoly Sverdlin
settled his $24 million jury verdict for $20 million, with the settlement value
equaling about 81% of the Jury Verdict.  81% of AMPS=[s] $35 million Jury Verdict would have an
approximate settlement value of $28.35 million.  Mark Swank=s 20% interest in the AMPS=[s] settlement would
therefore have a value of $5.76 million.

or[,]

c. The $20 million
Gardere Wynne settlement settled both the Anatoly Sverdlin $24.5 million jury
verdict and the AMPS=[s]
$35 million Jury Verdict. AMPS[=s]
proportionate share of the settlement would be 58.8% or approximately $11.76
million.  Mark Swank=s
20% shareholder interest in AMPS would have an approximate value of $2.35
million.

 

McCoy stated
that he sought to recover the following damages:

Mr.
Sverdlin received $20,000,000 in January 1999 for his $24,500,000 verdict
against Gardere Wynne.  This represents a recovery by Mr. Sverdlin of 82% of
his damages against Gardere Wynne.  Applying the same percentage of recovery
against the $35,000,000 verdict that AMPS received would result in AMPS
receiving $28,700,000.  It is [McCoy=s]
position that Mr. Sverdlin should separately forfeit his ill-gotten gain from
breaching his fiduciary duty to AMPS.  When Mr. Sverdlin=s ill-gotten gain of $20,000,000 is added to
the value of AMPS=[s]
verdict against Gardere Wynne, the resulting figure is $48,700,000.

 

. .
. .

 








In
the alternative and not by way of limitation, [McCoy] seeks the proceeds of the
Gardere settlement which should have been allocated, at an absolute minimum, on
the basis of AMPS=[s]
and Sverdlin=s
respective recoveries against Gardere Wynne.  Mr. Sverdlin received a
$24,500,000 verdict against Gardere Wynne.  AMPS received [a] $35,000,000
verdict against Gardere Wynne.  Accordingly, the minimum AMPS should have
received was 59% of the proceeds of the Gardere settlement.  Moreover, as soon
as Mr. Sverdlin attempted to usurp all of the benefits of the Gardere
settlement for his own benefit, which occurred before the settlement was
funded, the entire $20,000,000 should have gone to the benefit of AMPS.

   

Swank
and McCoy presented affidavits from Vincent Lee Marable, III, an attorney, in
response to appellees=
motions for summary judgment.  Marable stated that the distribution of the
entire $20 million in settlement proceeds directly to Sverdlin was not fair to
AMPS or to Swank and McCoy.  He also stated that appellees had breached
applicable standards of care.  Marable also provided Acausation@
opinions in the affidavits.  He stated that the applicable standard of care
required Calvin Verner, Battle Fowler, Beck Redden, and Smyser Kaplan to object
at the fairness hearing and that, had these appellees adhered to the applicable
standard of care, Athe
disbursement of the $20,000,000.00 settlement funds directly to Sverdlin
individually would have been stopped and AMPS=[s]
and McCoy=s and Swank=s rights with respect to
the settlement funds would have been preserved.@ 
Marable also stated that, Ahad
the Cunningham Group adhered to the standard of care by taking steps to prevent
the loss of AMPS=[s]
jury verdicts, AMPS=[s]
causes of action, and AMPS=[s]
assets, AMPS=[s] (and
McCoy=s and Swank=s) rights with respect to
the settlement funds, proceeds, and property, would have been preserved.@

The
summary judgment evidence established the following:  (1) that, before the
trial of the underlying litigation, Sverdlin did not plead a derivative claim
on behalf of AMPS for malpractice against Gardere Wynne; (2) that Sverdlin=s counsel, Lloyd
Cunningham, did not believe that Gardere Wynne had committed negligence against
AMPS; and (3) that Sverdlin did not present any expert testimony on the issue
of whether Gardere Wynne had committed negligence against AMPS. However, the
trial court submitted a jury question asking whether Gardere Wynne had
committed negligence against AMPS.  The jury awarded the total of $35 million
to AMPS based on the malpractice findings.  Sverdlin=s counsel, Lloyd Cunningham, then filed a
trial amendment adding a malpractice claim by AMPS against Gardere Wynne. 
Later, Cunningham sought to withdraw the trial amendment because he believed
that there was no evidence to support the jury=s
finding that Gardere Wynne had committed negligence against AMPS.  Cunningham
explained in his deposition in this cause that the Cunningham Group did not
pursue a negligence claim on behalf of AMPS against Gardere Wynne because A[he] honestly didn=t see support for that in
any of the evidence that [he] had prior to trial.@ 
He further explained:

During trial we didn=t pursue a claim for
negligence against Gardere, Wynne because we hadn=t
prepared ourselves for that.  In fact, we didn=t
have an expert that testified as to the failure of Gardere, Wynne to meet the
standard of care that was necessary to have as a predecessor to a malpractice
claim.  We had an expert that testified that they failed to meet the standard
of care with regard to Sverdlin, but we didn=t
have that same testimony or similar testimony on behalf of a claim that AMPS
might have for negligence.

 

The summary
judgment record supports Cunningham=s
conclusion because, in the absence of expert testimony that Gardere Wynne had
committed negligence against AMPS, there was no evidence to support the jury=s finding.  See F.W.
Indus., Inc. v. McKeehan, 198 S.W.3d 217, 221 (Tex. App.CEastland 2005, no pet.)
(causation in a legal malpractice suit must be proved by expert testimony
unless causation is within the jury=s
common understanding); Zenith Star Ins. Co. v. Wilkerson, 150 S.W.3d
525, 530 (Tex. App.CAustin
2004, no pet.) (expert testimony of an attorney is usually necessary to
establish the standard of skill and care ordinarily exercised by an attorney). 
Given the complex nature of the issues involved in the underlying litigation,
expert testimony would have been necessary to establish the standard of care
and causation with respect to a malpractice claim by AMPS against Gardere
Wynne.  Additionally, the trial court stated at the fairness hearing Athat Mr. Sverdlin=s individual malpractice
claims would have been the only claims to B
to survive the verdict against Gardere Wynne.@

Nonetheless,
Swank and McCoy assert that AMPS was damaged because it did not share in the
Gardere Wynne settlement proceeds.  At a hearing on January 13, 1999, the trial
court in the underlying litigation considered the Gardere Wynne settlement.  At
that hearing, Cunningham announced the terms of the settlement agreement.  He
stated that Gardere Wynne would be making a $20 million payment Ain consideration for which
we are dismissing request for a trial amendment we had on behalf of AMPS and we
are asking the Court to enter a take nothing judgment.@   Cunningham also stated that Sverdlin would
be receiving the $20 million settlement proceeds in his individual capacity and
that none of the proceeds would be going to AMPS.  Counsel for some of the
defendants stated that it was necessary to hold a fairness hearing to determine
whether it was fair to AMPS for Sverdlin to take the settlement proceeds and
not give any of the proceeds to AMPS. After hearing arguments from counsel, the
trial court stated as follows:

Okay. 
And there was a dispute as to whether or not the options had been properly
exercised and used and whether or not he was the sole shareholder or whether or
not those options were effective and somebody else was entitled to them.  Okay?

 

We
had a 6-week long trial, heard all the evidence, the jury came back and found
in favor of the plaintiff.  Okay.

 

Now,
is it fair for Mr. Sverdlin to receive the settlement funds that have been
offered in the settlement agreement by Gardere Wynne individually or should
AMPS and the very individuals that the jury has found whose conduct was
egregious in violation of their fiduciary duties, should they benefit from some
of those settlement funds?  That=s
the question, isn=t
it?

 

The trial court
then stated that it would approve the settlement agreement and the allocation
set forth in the agreement and that a fairness hearing would be held in the
future.  On January 13, 1999, the trial court entered a judgment as to Gardere
Wynne.  In the judgment, the trial court (1) denied the trial amendment
relating to AMPS=s
malpractice claims against Gardere Wynne, (2) approved the Gardere Wynne
settlement agreement, (3) set aside the jury=s
answers relating to the conduct of Gardere Wynne, and (4) adjudged that
Sverdlin take nothing by his claims against Gardere Wynne.

On
January 25, 1999, the trial court conducted the fairness hearing.  After
hearing comments from Cunningham, the trial court stated that Sverdlin=s individual malpractice
claims would have been the only claims to survive the verdict against Gardere
Wynne.  Counsel for the defendants in the underlying litigation did not make
any objections to the settlement.  The trial court found that the settlement
agreement between Sverdlin and Gardere Wynne met Aall
the requirements of substantial fairness to the corporation.@  We note that AMPS=s receiver did not object
to the settlement and that AMPS=s
board of directors ratified the settlement.[7]








Swank
and McCoy assert that the Cunningham Group should not have withdrawn the trial
amendment and that the other appellees should have objected to the Gardere
Wynne settlement.  Attempting to determine what would have happened B had the Cunningham Group
not withdrawn the trial amendment or had the other appellees objected to the
settlement B involves
uncertainty and pure speculation.  For example, a failure to withdraw the trial
amendment and any objection to the settlement must be considered in light of
the following facts:  (1) based on the jury=s
findings, the trial court declared that Sverdlin owned 100% of the stock in
AMPS; (2) grounds did not exist to support an allocation of the settlement
proceeds to AMPS because there was no evidence to support the jury=s malpractice finding in
AMPS=s favor against
Gardere Wynne; (3) the trial court=s
statement at the fairness hearing that only Sverdlin=s individual malpractice claims against
Gardere Wynne would have survived the verdict; and (4) the trial court=s framing of the issue at
the January 13, 1999 hearing B
A[S]hould AMPS and the
very individuals that the jury has found whose conduct was egregious in
violation of their fiduciary duties, should they benefit from some of those
settlement funds?@ 
Given these facts, it is highly speculative to assume that the trial court
would have sustained any objection to the settlement or awarded any of the
settlement proceeds to AMPS.

Swank
and McCoy did not present any summary judgment evidence establishing that a
reasonable or valid objection could have been made to the Gardere Wynne
settlement or that the trial court would have been required to grant such an
objection.  Swank=s and
McCoy=s expert,
Marable, stated that, had appellees adhered to applicable standards of care, Athe disbursement of the
$20,000,000.00 settlement funds . . . would have been stopped.@  Marable=s affidavits failed to
raise a fact issue on causation and damages for at least two reasons.  First,
the statement that the disbursement of the settlement funds would have been
stopped is mere speculation and conclusory.  Marable did not provide any facts
in his affidavit in support of his claim that the trial court would have
stopped the disbursement of the settlement proceeds.  Conclusory statements by
an expert are insufficient to support or defeat summary judgment.  Wadewitz
v. Montgomery, 951 S.W.2d 464, 466 (Tex. 1997).  Second, Marable did not
state any facts supporting a conclusion (1) that grounds existed for objecting
to the settlement or (2) that grounds existed for awarding a portion of the
settlement proceeds to AMPS.  Swank and McCoy offered no summary judgment
evidence showing that the complained-of conduct of appellees caused any damage
to AMPS.








Swank=s and McCoy=s claims that they were
damaged by AMPS=s
failure to recover part of the proceeds from the Gardere Wynne settlement is
based on Aspeculation
upon speculation.@  To
support their damages claims, Swank and McCoy would be required to speculate on
the following issues, among others: (1) Would the trial court have considered
any objection to the Gardere Wynne settlement in light of the facts (a) that no
evidence supported the jury=s
malpractice finding in favor of AMPS against Gardere Wynne, (b) that, based on
the jury=s findings,
the trial court had determined that Sverdlin owned 100% of the stock in AMPS,
and (c) that, based on the jury=s
findings, the trial court considered Swank, McCoy, and the other defendants to
be wrongdoers?; (2) Would the trial court have sustained an objection to
the settlement agreement and refused to approve the settlement unless some of
the proceeds were allocated to AMPS?; (3) Would Sverdlin have gone through with
the settlement if the trial court had allocated a portion of the proceeds to
AMPS?; (4) Assuming that the trial court allocated part of the proceeds to AMPS
and that AMPS received the proceeds, would AMPS have distributed some part of
the proceeds to its shareholders, as opposed to, for example, paying off its
creditors or investing the proceeds in the further development of the FCIS
system?; and (5) Could Swank and McCoy establish that they were in fact owners
of 20% of the shares in AMPS?








Likewise,
Swank=s and McCoy=s alternative claim that
they were damaged by AMPS=s
failure to recover on its jury verdict against Gardere Wynne is based on Aspeculation upon
speculation.@  Their
alternative damages theory is based on a number of speculations, including the
following: (1) that the Gardere Wynne settlement, which required a release of
AMPS=s claims, would
have failed for some reason; (2) that the trial court would have upheld AMPS=s $35 million verdict
against Gardere Wynne even though (a) the trial court had denied AMPS=s trial amendment, (b)
there was no evidence to support the jury=s
malpractice finding in favor of AMPS against Gardere Wynne, and (c) the trial
court stated that only Sverdlin=s
individual malpractice claims against AMPS would have survived the verdict; (3)
that, if the trial court had entered judgment in the amount of $35 million in
favor of AMPS against Gardere Wynne, the court of appeals would not have
reversed the judgment even though the court of appeals reversed the trial court=s judgment in all respects
as to the non-settling defendants, concluding that Sverdlin=s damages models were not
supported by the evidence; (4) that, if the court of appeals upheld the
judgment, AMPS would have recovered some amount of money from Gardere Wynne;
(5) that, assuming that AMPS recovered some amount, AMPS would have distributed
some part of the proceeds to its shareholders as opposed to (for example)
paying off its creditors or investing the proceeds in the further development
of the FCIS system; and (6) that Swank and McCoy could establish that they each
owned 20% of the shares of stock in AMPS.

Swank=s and McCoy=s claims that they were
damaged as a result of AMPS=s
failure to share in the proceeds of the Gardere Wynne settlement or AMPS=s failure to recover on its
jury verdict against Gardere Wynne are based on the above series of
speculations.  The alleged damages may not be recovered because they are Atoo remote, too uncertain,
or purely conjectural.@ 
See Arthur Andersen, 945 S.W.2d at 816.[8]     


Because
Swank=s and McCoy=s causation and damages
theories were fatally speculative, the trial court did not err in granting (1)
traditional summary judgments to the Cunningham Group on Swank=s and McCoy=s breach of fiduciary duty
claims and to Calvin Verner, Battle Fowler, Beck Redden, and Smyser Kaplan on
Swank=s and McCoy=s breach of fiduciary duty
and negligence claims.  For the same reasons, the trial court did not err in
granting summary judgment to the Cunningham Group on Swank=s and McCoy=s conversion claims; to
Calvin Verner, Battle Fowler, Beck Redden, and Smyser Kaplan on Swank=s and McCoy=s conspiracy claims; and to
Lloyd Cunningham on Swank=s
and McCoy=s fraud
claims.[9] 
Additionally, because Swank and McCoy failed to produce more than a scintilla
of probative evidence to raise a genuine issue of material fact on their damage
claims, the trial court did not err in granting no-evidence summary judgments
to Calvin Verner and Battle Fowler on Swank=s
and McCoy=s breach of
fiduciary duty, negligence, and conspiracy claims.  

                                                    Claims
for Disgorgement of Fees








A
client need not prove actual damages to obtain forfeiture of an attorney=s fee for the attorney=s breach of fiduciary duty
to the client.  Burrow v. Arce, 997 S.W.2d 229, 240 (Tex. 1999). In Burrow,
the Texas Supreme Court cited the proposed Restatement
(Third) of the Law Governing Lawyers '
49 (Proposed Final Draft No. 1, 1996), which provided that A[a] lawyer engaging in
clear and serious violation of a duty to a client may be required to forfeit
some or all of the lawyer=s
compensation for the matter.@[10] 
Id. at 241.  The fee forfeiture remedy is based on two ideas.  First, a
client does not receive the benefit of the bargain if the attorney breaches
fiduciary duties owed to the client.  Second, fee forfeiture is a deterrent to
an attorney breaching fiduciary duties to a client.  Id. at 237-38.  In
some fee forfeiture cases, denying an attorney all compensation would be an
excessive sanction because it would give a windfall to the client.  Id.
at 241-42.

Swank
and McCoy seek forfeiture of all fees received by Calvin Verner, Battle Fowler,
Beck Redden, and Smyser Kaplan in their representation of Swank and McCoy. 
Swank and McCoy also seek forfeiture of all fees received by the Cunningham
Group in its representation of AMPS.  The record demonstrates that Swank and
McCoy did not pay any legal fees to Calvin Verner, Battle Fowler, Beck Redden,
and Smyser Kaplan.  Instead, LDNGH (a codefendant in the underlying litigation)
paid Calvin Verner=s
and Battle Fowler=s
fees relating to their representation of Swank and McCoy.  LDNGH initially paid
Beck Redden=s and
Smyser Kaplan=s fees
relating to their representation of Swank and McCoy.  Later, Smyser Kaplan=s fees relating to its
representation of McCoy were the subject of a contingency fee agreement.  Swank
and McCoy did not pay any legal fees to the Cunningham Group in connection with
its representation of AMPS.








Because
Swank and McCoy did not pay any legal fees to the appellee lawyers, allowing
Swank and McCoy to recover them as a fee forfeiture would result in a windfall
to them.  Equity does not support such a Awindfall@ result; therefore, fee
forfeiture is not an appropriate remedy in this cause.  Cf. Tener v.
Bracewell, No. 14-00-00442-CV, 2002 WL 15937, *2 (Tex. App.CHouston [14th Dist.] June
3, 2002, no pet.) (not designated for publication) (allowing a client, rather
than the insurer that actually paid the legal fees, to recover the fees from
the attorney Awould
not be compensation but a windfall@).[11] 
The trial court did not err in granting summary judgment to appellees on Swank=s and McCoy=s fee forfeiture claims.

                                                                     Conclusion

For
the reasons set forth above, the trial court properly granted summary judgment
to appellees on the following grounds: (1) that Swank and McCoy lack standing
to assert their claims; (2) that Swank=s
and McCoy=s causation
and damages theories are fatally speculative; and (3) that Swank and McCoy are
not entitled to fee disgorgement.  Because summary judgment was proper on these
grounds, we need not address the merits of the other summary judgment grounds
advanced by appellees.  We overrule Swank=s
and McCoy=s appellate
issues.

                                                               This
Court=s Ruling

We
affirm the judgment of the trial court.

 

 

TERRY McCALL

JUSTICE

 

March 27, 2008

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]In its opinion, the Houston First Court of Appeals
stated that ASwank and McCoy exercised their stock options in AMPS.@  Swank, 121 S.W.3d at 790.  However, there is
no evidence in the record that Sverdlin performed his side of the option
contract by delivering stock to them or that there was a judicial declaration
that Sverdlin was obligated to perform under the option contracts. 





[2]In Swank=s and McCoy=s second amended petition, which was the live pleading
when Smyser Kaplan and Beck Redden filed their motions for summary judgment,
they alleged the same twenty-three acts and omissions as grounds for negligence
and breaches of fiduciary duty against Beck Redden and Smyser Kaplan.  They
also alleged the same twenty-three acts and omissions as grounds for negligence
against Calvin Verner and Battle Fowler.   All twenty-three of the alleged acts
and omissions related in some manner to the Gardere Wynne settlement.  In
essence, Swank and McCoy alleged legal malpractice claims that were based on
negligence.  Any attempt to recast the negligence allegations as breach of
fiduciary duty allegations would constitute an improper fracturing of the legal
malpractice claim.  See Deutsch v. Hoover, Bax & Slovacek, L.L.P.,
97 S.W.3d 179, 189 (Tex. App.CHouston [14th
Dist.] 2002, no pet.); Cuyler v. Minns, 60 S.W.3d 209 216 (Tex. App.CHouston [14th Dist.] 2001, pet. denied); Sledge v.
Alsup, 759 S.W.2d 1, 2-3 (Tex. App.CEl
Paso 1988, no writ).  However, the outcome of this appeal remains the same
whether Swank=s and McCoy=s
claims are characterized as negligence claims, breach of fiduciary duty claims,
or both.





[3]When a party challenges jurisdiction by way of a plea
to the jurisdiction and the determination of the jurisdictional issue involves
an alleged factual dispute, Athe trial court
reviews the relevant evidence to determine if a fact issue exists,@ and the Asummary
judgment standard of proof @ is used.  Kilpatrick,
205 S.W.3d at 700 (quoting Tex. Dep=t of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 227-28 (Tex. 2004)).





[4]Appellees Smyser Kaplan, Beck Redden, Calvin Verner,
and Battle Fowler did not move for summary judgment on the ground that Swank
and McCoy lacked standing because they were not shareholders in AMPS.  However,
all appellees moved for summary judgment on the ground that Swank and McCoy
lacked standing to assert claims belonging to AMPS in their individual
capacities.





[5]Swank and McCoy alleged in their pleadings in the trial
court that they had standing to maintain AMPS=s
claims under the prior law found in Article 5.14 of the Texas Business
Corporation Act.  Section 21.563 of the Business Organizations Code made no
substantive changes to Article 5.14(L) of the Texas Business Corporation Act. 
With the exception of filing fee requirements, the provisions of the Business
Organizations Code do not apply until January 1, 2010, to entities formed
before January 1, 2006, such as AMPS, unless the entities elect early
adoption.  See Tex. Bus. Orgs.
Code Ann. '' 402.001-.005 (Vernon Pamph. 2007).  Whether or not
AMPS elected early adoption of the Business Organizations Code, the analysis is
the same because Section 21.563 made no substantive changes to Article
5.14(L).  Therefore, we elect to address this issue under the current version
of the statute.





[6]Section 21.563(c) is similar to Principles of Corporate Governance:  Analysis and Recommendation
' 7.01(d) (2005).  Section 7.01(d) provides:

 

In the case of a closely held corporation [' 1.06], the court in its discretion may treat an action
raising derivative claims as a direct action, exempt it from those restrictions
and defenses applicable only to derivative actions, and order an individual
recovery, if it finds that to do so will not (i) unfairly expose the
corporation or the defendants to a multiplicity of actions, (ii) materially
prejudice the interests of creditors of the corporation, or (iii) interfere
with a fair distribution of the recovery among all interested persons.





[7]Appellees moved for summary judgment on the ground that
AMPS=s board ratified the settlement agreement. 
Ratification is an affirmative defense.  Land Title Co. of Dallas, Inc. v.
F.M. Stigler, Inc., 609 S.W.2d 754, 756 (Tex. 1980).  As such, appellees
had the summary judgment burden of establishing ratification as a matter of
law.  Am. Tobacco Co., 951 S.W.2d at 425.  A challenged transaction
found to be unfair to the corporate enterprise may nonetheless be upheld if
ratified by a majority of disinterested directors or the majority of the
stockholders.  Gearhart Indus., Inc. v. Smith Int=l, Inc., 741
F.2d 707, 720 (5th Cir. 1984) (applying Texas law).  While appellees did
present summary judgment evidence establishing that AMPS=s board ratified the settlement, they did not present
any summary judgment evidence establishing that the directors who ratified the
settlement were Adisinterested.@ 
Therefore, appellees failed to meet their summary judgment burden of
establishing ratification as a matter of law.





[8]We note that the trial court granted special exceptions
requiring Swank and McCoy to plead facts and legal theories supporting their
claims for damages.  Swank=s and McCoy=s
counsel approved as to form and substance the trial court=s agreed order on special exceptions.  While Swank and
McCoy amended their petition after the trial court granted the special
exceptions, they did not change their damage theories.





[9]Swank and McCoy alleged that appellees breached their
duties in connection with Athe application of the credit [that the Gardere Wynne]
settlement proceeds allowed.@  Swank and
McCoy did not allege how they were damaged by the manner in which the
settlement credit was allocated among the defendants in the underlying
litigation.  In fact, Swank and McCoy were not damaged by the allocation of the
settlement credit.  As a result of the court of appeals=s judgment in the underlying litigation, neither Swank
nor McCoy owed any damages to Sverdlin or AMPS.  Thus, the issue of whether
Swank and McCoy were entitled to receive credit for the Gardere Wynne
settlement was immaterial.  Swank and McCoy also alleged that the Cunningham
Group breached its fiduciary duty to AMPS by allowing the proceeds from the
Gardere Wynne settlement to be used as a settlement credit to offset the amount
awarded to AMPS on its breach of fiduciary duty claims.  AMPS was not damaged
by the offset because the court of appeals rendered judgment that AMPS take
nothing by its claims.





[10]For current Restatement provision, see Restatement (Third) of the Law Governing
Lawyers ' 37 (2000).





[11]Some of the appellees cite Liberty Mut. Ins. Co. v.
Gardere & Wynne, L.L.P., 82 F. App=x
116, 117-21 (5th Cir. 2003) (not designated for publication); Bell v.
Phillips, No. 14-00-01189-CV, 2002 WL 576036 (Tex. App.CHouston [14th Dist.] Apr. 18, 2002, no pet.) (not
designated for publication); and Universal Fleet Leasing, Inc. v. Pope,
No. 01-99-01235-CV, 2000 WL 1708515 (Tex. App.C
Houston [1st Dist.] Nov. 16, 2000, pet. denied) (not designated for
publication), in support of the argument that Swank and McCoy are not entitled
to fee forfeiture.  Those cases did not involve the precise issue that is
before us in this cause.  In Liberty Mutual, a client did not seek to
recover fees that it had paid to its law firm.  Rather, the client sought to
recover fees that its former law firm had earned in representing an opponent in
a suit, and the fees had been paid by the opponent.  The Liberty Mutual court
held that the trial court had not erred in refusing to allow the client to
recover fees paid by other clients.  Liberty Mutual, 82 F. App=x at 121.  In Phillips, an attorney was retained
on a contingency fee agreement, and the attorney was never paid any fees during
his representation of the client.  The court held that, because the attorney
had not been paid any fees, the client did not have a claim for fee forfeiture. 
Phillips, 2002 WL 576036 at *8 n.3.  In Pope, the client claimed
that he had paid Aover $25,000.00 in attorneys fees@ to his attorneys.  However, the client failed to present
any evidence that he had paid any fees in connection with the matter at issue. 
Therefore, the court held that the client had produced no evidence showing that
he was entitled Ato a disgorgement of fees paid in connection with this
matter.@  Pope, 2000 WL 1708515 at *3.  This cause is
distinguishable from Liberty Mutual, Phillips, and Pope
because, in this cause, four of the appellee law firms received fees, albeit
from another party, in connection with their representation of Swank and McCoy.